803 So.2d 1 (2001)
STATE of Louisiana
v.
Antoinette FRANK.
No. 99-KA-0553.
Supreme Court of Louisiana.
January 17, 2001.
Opinion Revised April 4, 2001.
*4 Frank J. Larre, Metarie, Denise LeBoeuf, New Orleans, Nicholas J. Trenticosta, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Valentin M. Solino, Susan E. Talbot, Counsel for Respondent.
KIMBALL, Judge.
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The defendant's appeal is based on a total of thirty-two assignments of error.[1] However, the principal issues involve (1) the denial of the defendant's pre-trial motion to be declared indigent for the purposes of obtaining state-funded experts; and (2) the denial of the defendant's motion for change of venue. We find that none of the defendant's arguments concerning the guilt phase of her trial constitute reversible error; therefore, the defendant's conviction *5 is affirmed. However, we find that the trial court erred by failing to declare the defendant indigent for the purpose of allowing her the opportunity to show entitlement to state-funded psychiatric and mitigation expert assistance for the sentencing phase of her trial. The defendant's case is, therefore, remanded to the trial court in order for it to hold an evidentiary hearing as to whether the defendant was entitled to state-funded expert assistance for the penalty phase of her trial. If, after a hearing on the matter, the court determines she was so entitled, it is to vacate the defendant's sentence and order a new penalty phase at which the defendant will have the benefit of that expert assistance. If the trial court finds that the defendant cannot make the proper showing of need for obtaining state funds, the defendant may appeal that decision to this court along with the other assignments of error regarding the penalty phase of her trial, the merits of which we do not reach at this time.

Facts
On March 4, 1995, the defendant, then an officer with the New Orleans Police Department, and Rogers Lacaze were arrested and charged with three counts of first degree murder for the deaths of Ronald Williams, Ha Vu, and Cuong Vu. The murders occurred in the early morning hours at the Kim Anh Restaurant in New Orleans East. The Vu family owned the restaurant, and Ronald Williams was an off-duty police officer performing security detail that evening at the restaurant. The defendant had occasionally worked at the restaurant as a security guard and was familiar with the Vu family and Ronald Williams. She and her co-defendant visited the restaurant several times on the night of the murders.
As the restaurant was closing early that morning, Chau Vu, sister of two of the victims, went into the kitchen to count money. She reentered the dining room of the restaurant to pay Ronald Williams, when she noticed the defendant approaching the restaurant yet again. Sensing something was wrong, Chau Vu ran back to the kitchen and hid the money in the microwave before returning to the front of the restaurant. Using a stolen key, the defendant entered the restaurant and began to walk quickly to the back of the building, pushing Chau, one of Chau's brothers, Quoc, and a restaurant employee along with her. Shots rang out, and the defendant ran back to the front of the restaurant. Chau, Quoc, and the employee hid in a cooler in the kitchen, concerned because they did not know the whereabouts of Chau's and Quoc's sister and brother, Ha and Cuong. From inside the cooler, Chau and Quoc could partially see the front of the restaurant. Chau initially could see the defendant, who appeared to be looking for something. The defendant moved out of Chau's line of vision, and then the three hiding heard additional gunshots. Quoc next observed the defendant searching in the area where the Vus usually kept their money. He then saw her walk over to the area where he later found the bodies of his brother and sister, and he heard more gunshots. After the defendant and Rogers Lacaze left the premises, Quoc emerged from the cooler and called 911 to report the murders.
After police officers arrived on the scene, the defendant returned to the restaurant as well. She approached Chau, asking her what happened. Chau found another officer and reported what she had witnessed. After Chau was interviewed in more detail, the defendant and Rogers Lacaze were arrested and charged with first degree murder.
The defendant and Rogers Lacaze were indicted by an Orleans Parish Grand *6 Jury on April 28, 1995. Their trials were severed, and Rogers Lacaze was tried first on July 17-21, 1995, found guilty as charged, and sentenced to death. The defendant's trial began on September 5, 1995, and on September 12, 1995, the jury returned a guilty verdict on all counts and recommended a sentence of death as to all counts. The defendant was formally sentenced to death on October 20, 1995.

Motion to be Declared Indigent
In her first six assignment of errors, the defendant argues that the trial court abused its discretion in not finding her indigent. She further argues that she was entitled to make a showing of need for state-funded experts, but that her right was foreclosed by the court's denial of her motion on indigent status. See State v. Touchet, 93-2839, p. 6 (La.9/6/94), 642 So.2d 1213, 1216 (holding that "for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial").
On August 29, 1995, approximately one week before the defendant's trial was to begin, the trial court conducted a brief evidentiary hearing on the defendant's motion to have herself declared indigent.[2] The court allowed the defendant to take the stand and testify as to her financial status and ability to pay for the expert services she was requesting that the state fund. The defendant testified that her mother had retained counsel for her, that neither she nor her family owned any real property, that she owned a nineteen-year-old Ford Elite which she bought for $600, that she had accrued benefits with the New Orleans Police department but did not know how much or how she could access the money, and that her mother had sold her furniture for approximately $6000.00, which was used to pay pre-existing obligations and her attorney's fee.
*7 The trial court denied her motion on the following day, stating that she was not indigent.[3] In its November 27, 2000, per curiam to this court on the issue of the defendant's indigent status, the trial court explained that it had not found the defendant indigent, because it found that she had certain funds available for her defense, consisting of $3800.00 in pension benefits, $1800.00 from furlough time, and $6000.00 from the sale of her furniture. Therefore, the trial court based its finding on the fact that, at most, the defendant at one time had available the approximate sum of $11,600.00 for her defense.
A trial court must consider several factors before determining whether a defendant is indigent and may review its determination at any time during the proceedings. Louisiana Rev.Stat. 15:147(B)(1) provides that:
In determining whether or not a person is indigent and entitled to the appointment of counsel, the court shall consider whether the person is a needy person and the extent of his ability to pay. The court may consider such factors as income or funds from employment or any other source, including public assistance, to which the accused is entitled, property owned by the accused or in which he has an economic interest, outstanding obligations, the number and ages of dependents, employment and job training history, and level of education.
See also State v. Adams, 369 So.2d 1327, 1329 (La.1979) (citing La.Rev.Stat. 15:147 and 15:148); W. LaFave and J. Israel, 2 Criminal Procedure § 11.2(e) (1984) ("recognizing that the Supreme Court has never offered a specific definition of indigency, but noting that most jurisdictions consider the following factors: (1) income from employment and governmental programs such as social security and unemployment benefits; (2) money on deposit; (3) ownership of real and personal property; (4) total indebtedness and expense; (5) the number of persons dependent on the appellant for support; (6) the cost of the transcript on appeal; and (7) the likely fee of retained counsel for the appeal.").
Applying these factors for determining indigency to the evidence adduced at the August 29, 1995, hearing and through the trial court's investigation into the defendant's benefits from the police department, the record reflects the following: (1) defendant initially retained defense counsel through her mother; (2) defendant had been terminated from the police force and was receiving no income; (3) defendant had accrued retirement benefits of approximately $3,800, which the trial court ordered to go directly to the court reporters; (4) defendant had access to approximately $1800.00 from furlough time; (5) defendant did not own any real property; (6) defendant owned a 1976 Ford Elite for which she paid $600, and which was impounded by police; (7) defendant had sold all her furniture and effects two weeks after her arrest for approximately $6,000; (8) defendant had her mother use money from sale of furniture to pay existing debts and attorney's fees; *8 (9) defendant's mother did not own any real property and is disabled; and (10) defendant had $600 in savings at the time of her arrest, and nothing in savings at the time of the indigency hearing. In addition, with the motion to proceed as an indigent, defendant and both her attorneys submitted affidavits indicating that defendant had exhausted all of her personal funds.
Under the standards set forth in our jurisprudential and statutory law, the defendant was indigent for the purposes of obtaining state-funded expert assistance. Even if, at one time, the defendant may have had access to approximately $11,000.00, Louisiana law provides that the trial court may reassess a determination of indigency at any time, in recognition of the fact that a defendant's financial status may not be static and that a defendant may become indigent at any point in the proceedings. See La.Rev.Stat. 15:147(A)(1)(a) (providing that a determination of indigency "may be reviewed by the court at any... stage of the proceedings"); State v. Barnes, 496 So.2d 1056, 1059 (La.App. 4th Cir.1986) (finding that a defendant is considered indigent for sentencing purposes if he is found to be indigent at any point in the proceedings, including while on appeal); State v. Huffman, 480 So.2d 396, 398-99 (La.App. 4th Cir.1985) (same).
On August 29, 1995, the defendant testified that the $6000.00 received for her furniture had already been used to satisfy pre-existing obligations and to pay attorney's fees. Further, the trial judge ordered that the money the defendant had accrued in her retirement fund go directly to the court reporters for transcripts. At most, under the trial court's calculation, the defendant was left with approximately $1800.00 at the time of the pre-trial hearing. Even assuming she had access to that money to pay counsel and assuming that the entire $6,000 in proceeds from the sale of defendant's furniture all went to counsel's fee, that sum is low compared to what a reasonable retained counsel might charge to represent someone in a capital case. We further note that eight months after the defendant's trial ended, the same trial judge declared her indigent for purposes of her appeal, although the record reflects no change in the defendant's financial status from the pre-trial hearing.
Thus, we find that the trial judge abused his discretion in not declaring the defendant indigent at the pre-trial hearing. However, that determination does not end the inquiry, as the court must now consider what, if any, prejudice the defendant suffered as a result of not being declared indigent.
In Ake v. Oklahoma, 470 U.S. 68, 76, 105 S.Ct. 1087, 1092, 84 L.Ed.2d 53 (1985), the United States Supreme Court construed the Fourteenth Amendment's due process clause to guarantee that, in a prosecution against an indigent defendant, the state "take steps to assure that the defendant has a fair opportunity to present his defense." One "step" the state must take is to ensure that the indigent defendant is provided with effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A further component of the state's obligation to provide effective assistance of counsel is to also furnish the indigent defendant's counsel with all of the "`basic tools of an adequate defense.'" Ake, 470 U.S. at 77, 105 S.Ct. at 1093 (quoting Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971)).
The Court in Ake held that a state-funded psychiatric expert is a "basic tool" for a defendant's case, "when the defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial...." 470 *9 U.S. at 83, 104 S.Ct. at 1096. This court has extended the constitutional right of indigent defendants recognized in Ake to other types of expert assistance considered crucial to an indigent's defense.
For example, this court has held that the right to a private investigator may in many cases be an adjunct to the right to counsel, because furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense. State v. Madison, 345 So.2d 485, 490 (La.1977) (citing United States v. Johnson, 238 F.2d 565, 572 (2d Cir.1956) (Frank, J., dissenting); Note, The Indigent's Right to an Adequate Defense: Expert and Investigational Assistance in Criminal Proceedings, 55 Cornell L.Rev. 632 (1970); Note, Right to Aid in Addition to Counsel for Indigent Criminal Defendants, 47 Minn.L.Rev. 1054 (1963); ABA Standards for Criminal Justice Relating to Proving Defense Services (1967), § 1.5 and commentary). In Madison, the court reiterated the fundamental principle that the kind of trial a man gets cannot be made to depend on the amount of money he has. Id. (citing Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956)). Therefore, when an indigent defendant shows that his attorney is unable to obtain existing evidence crucial to the defense, the means to obtain it should be provided for him. Id. (finding that indigent defendant in that case had not made a sufficient showing of need to justify the procurement of an investigator).
In State v. Craig, 93-2515, 93-2654, 93-2589, p. 13 (La.5/23/94), 637 So.2d 437, 446-47, the court upheld a trial court decision ordering payment for the services of an investigator, a psychologist, and a mitigation expert, finding that those services were necessary to provide the indigent defendant with an adequate opportunity to present his defense. However, the court in Craig recognized that an indigent defendant's unlimited right to state-funded expert services would carry with it a great potential for abuse. Id. at 446. Therefore, the court emphasized that an indigent defendant wishing to obtain funding for the production or gathering of any evidence must make a showing of the necessity for those services. Id. at 447.
This court addressed the specific issue of what showing an indigent needs to make in order to obtain state-funded expert assistance in more detail in State v. Touchet, 93-2839 (La.9/6/94), 642 So.2d 1213. In that case, the court elaborated on its holding in Craig, stating that:
Henceforth, for an indigent defendant to be granted the services of an expert at the expense of the state, he must establish that there exists a reasonable probability both that an expert would be of assistance to the defense and that the denial of expert assistance would result in a fundamentally unfair trial. To meet this standard, a defendant must ordinarily establish, with a reasonable degree of specificity, that the assistance is required to answer a substantial issue or question that is raised by the prosecution's case or to support a critical element of the defense. If the trial court finds that the indigent defendant is able to meet this standard, it is to authorize the hiring of the expert at the expense of the state.
Id. at 1216.
The court's most recent pronouncement on this subject is found in State v. Jones, 97-2593, p. 4 (La.3/4/98), 707 So.2d 975, 977, where it held that the retention of private counsel from a collateral source of funds at no cost to the defendant did not affect a defendant's ability to prove indigency. The court recognized that regardless of whether a defendant derives any assistance from an ancillary source, "[t]he *10 determinative question is the defendant's indigency" in assessing whether he or she is entitled to make a showing of need for state-funded expert assistance. Id. The court further suggested that even if a defendant retains counsel at his own expense, he may still be eligible for state-funded auxiliary services, but his alleged indigency status should be more closely questioned. Id. The Jones court concluded that a defendant, who has private counsel retained by a collateral source, may still be entitled to state funding for expert assistance provided he or she can meet the requirements articulated in Touchet. Id. at 977-78.
The court has made clear that an indigent defendant is entitled to present a trial court with evidence of his or her need for state-funded expert assistance at a hearing on the matter. See Touchet, 642 So.2d at 1221. In the present case, the trial court precluded the defendant from making such a showing of need by refusing to find her indigent in the first place. While the defendant filed an ex parte application for expert funding, specifically requesting psychiatric/psychological expert assistance for both the guilt and penalty phase of her trial and a mitigation expert/social worker for the penalty phase and providing how much that assistance would cost, the trial court failed to address the application or hold a hearing on the matter.[4] As a result, the defendant argues she was forced to go to trial without necessary expert assistance, which prejudiced her ability to present an adequate defense at both the guilt and penalty phase.[5]
Regarding the defendant's request for psychiatric and/or psychological expert assistance for the guilt phase of her trial, her argument that the trial court's error in not finding her indigent precluded her from making the appropriate showing of need for this assistance is without merit. Louisiana law is well-settled that evidence of mental condition or defect is inadmissible at the guilt phase of a capital case unless the defendant has pleaded not guilty by reason of insanity. State v. Koon, 96-1208, p. 19 (La.5/20/97), 704 So.2d 756, 768; State v. Deboue, 552 So.2d 355, 366 (La.1989); State v. Lecompte, 371 So.2d 239, 243 (La.1978), on rehearing, (La.5/21/79). The defendant never argued that she was insane or incompetent to proceed at trial, and, therefore, she was *11 not entitled to admit psychiatric testimony as to her mental condition during the guilt phase in the first place. Therefore, the trial court's finding that the defendant was not indigent had no bearing whatsoever on the outcome of her case during the guilt phase of the trial.
However, because both this court and the Supreme Court have repeatedly stressed that a capital defendant has the right to introduce virtually any evidence in mitigation during the penalty phase of a capital trial, we find the trial court committed error in not allowing the indigent defendant the opportunity to make a showing under Touchet as to her need for state-funded assistance for the purpose of presenting any such mitigating evidence. See State v. Brumfield, 96-2667, p. 50 (La.10/20/98), 737 So.2d 660, 686 (citing Lockett v. Ohio, 438 U.S. 586, 605-606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); State ex rel. Busby v. Butler, 538 So.2d 164 (La. 1988)). By not allowing a hearing on the matter, the trial court did not provide this court with adequate information upon which to review the question of whether the defendant was entitled to the expert assistance she requested for the penalty phase of her trial and what prejudice she may have suffered as a result of not obtaining state-funded assistance.[6]See State v. Prestridge, 399 So.2d 564, 581 (La.1981) (stating that when an indigent defendant has been denied funds to obtain expert assistance, the issue on review becomes whether the denial of funds substantially prejudiced the defendant at trial); State v. Monroe, 397 So.2d 1258, 1266 (La.1981) (finding that the indigent defendant was not substantially prejudiced by the denial of expert assistance at trial).
We therefore find it necessary to remand the case for an evidentiary hearing at which the defendant will be afforded the opportunity to make the necessary showing under Touchet for obtaining state-funded expert assistance. If she is able to meet the standards provided in Touchet, the trial court is to vacate the defendant's sentence, order a new penalty hearing, and order that state funds be procured so that the defendant may hire the requested experts to assist her defense at the sentencing hearing. If the trial court finds that the defendant can not make the proper showing of need, the defendant may appeal that decision to this court along with the other assignments of error concerning the penalty phase of her trial.
The defendant's conviction is affirmed for the reasons that her indigent status did not have any effect on her case during the guilt phase of the trial and because we do not find that any of her other arguments constitute reversible error.

Motion for Change of Venue
In her seventh, eighth, ninth, and tenth assignments of error, the defendant argues that the trial court erred by denying her motion for a change of venue.
After the first two individuals on the first panel of prospective jurors were examined, defense counsel filed a motion to change venue on grounds that widespread *12 publicity in the parish had deprived the defendant of the opportunity for a fair trial. The trial court expressed some surprise that defense counsel had not filed a pre-trial motion on this issue, but recognized that the motion could be filed at any time at which it appeared the defendant's Sixth Amendment Rights were being violated. The trial court allowed the motion to be made, but ordered that jury selection continue. Jury selection was completed in one day. On the following morning, September 6, 1995, the trial court heard arguments from both sides on the motion for change of venue and ultimately denied the motion.
A defendant is guaranteed an impartial jury and a fair trial. To accomplish this end, the law provides for a change of venue when a defendant demonstrates his inability to obtain an impartial jury or fair trial at the place of original venue. State v. Bell, 315 So.2d 307, 309 (La.1975) (citing Groppi v. Wisconsin, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)).
The specific provision of Louisiana law providing for a change of venue is found in La.Code Crim.Proc. art. 622:
A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
This article was adopted as part of the Code of Criminal Procedure in 1966. It changed the test used previously in Louisiana to determine whether a change of venue was necessary. The former rules had been concisely stated in State v. Scott, 237 La. 71, 85, 110 So.2d 530, 535 (1959) (citations omitted):
The burden of establishing that an applicant cannot obtain a fair trial in the parish where the crime was committed rests with him. The test is whether there can be secured with reasonable certainty from the citizens of the parish a jury whose members will be able to try the case on the law and evidence, uninfluenced by what they may have heard of the matter and who will give the accused full benefit of any reasonable doubt arising either from the evidence or the lack of it. The power to grant a change of venue rests in the sound discretion of the trial judge, whose ruling will not be disturbed in the absence of a showing of clear abuse thereof.
However, the legislature found this judicial interpretation deficient in that it confused the separate and distinct grounds for challenging objectionable jurors for cause and for change of venue. Bell, 315 So.2d at 309. Thus, when Article 622 was enacted, the legislative intent regarding the separate nature of the two tests for challenging jurors and changing venue was expressed in the Official Revision Comment, which stated that the former "test for change of venue, as interpreted by the jurisprudence, is much weaker than was intended by the express language used in [the former statutory provision]." Quoted in Bell, 315 So.2d at 310. The Comment *13 went on to explain that under Scott, the test for change of venue was "nothing more than valid grounds for challenges for cause." Id. The legislature, therefore, found that:
These [sic] leads to the conclusion that if the defendant cannot successfully challenge for cause he has no grounds for a change of venue; and furthermore, that if he does challenge for cause and the objectionable jurors are thus removed he has no grounds for change of venue. Logically, therefore, change of venue did not exist as a concept separate from challenge for cause....
The foregoing suggests that the emasculated change of venue test as announced by the supreme court has no value. It is thus clear that the change of venue concept must be one which overrides the challenge for cause concept and is to be superimposed upon the entire proceeding. A change of venue ought to be available even though, individually, each juror is not susceptible to a valid challenge for cause, if the defendant can show that overriding all of these things and superimposed upon all of them he still cannot get a fair trial. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly.
It is the purpose of the second paragraph of this article to effect such a policy and to overcome the jurisprudence in the cases cited above.
Id. (citations omitted).
After considering the Revision Comment and the language of Article 622, this court in Bell enumerated several relevant factors that would help guide the judiciary in determinations of whether to change venue under the new provision. Those factors are: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire. Bell, 315 So.2d at 311.
The court instructed that under the new provision, it was no longer appropriate for a trial court to only inquire as to whether the individual prospective jurors could be fair and impartial and uninfluenced by what they had heard or had seen outside the court. Bell, 315 So.2d at 313. The focus must extend beyond the prejudices and attitudes of the individual venire persons, and the defendant must be allowed to show that, even if it would be possible to select a jury whose members were not subject to a challenge for cause, that there exists prejudice or influences within the community at large that would affect the jurors' answers during voir dire or the testimony of witnesses at the trial, or that for any other reason, a fair and impartial trial could not be held in the parish. Id. The trial court's ultimate determination must be of the community's attitude toward the defendant. Id.
Shortly after the Bell decision, the court addressed the issue again in State v. Rudolph, 332 So.2d 806, 809 (La.1976), where it reiterated that, "under the test set forth in article 622 of the Code of Criminal Procedure, the fact that a jury can be *14 selected, i.e., that the requisite number of jurors are not subject to a valid challenge for cause, does not mandate the conclusion that a motion for change of venue was properly denied by the trial court." The court further explained that a change of venue may be necessary to ensure a fair trial even if, individually, each juror is not susceptible to a valid challenge for cause, because the overriding state of the public mind against the defendant may cause the jurors not to answer completely honestly during voir dire. Id.
While the legislature may have changed the test previously used in this state to determine whether venue should be changed under Article 622, the Bell court noted that the burden of proof on the defendant to show actual prejudice and the discretion accorded the trial court were not changed. Bell, 315 So.2d at 309-10. The burden of proof remains on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible.[7]State v. Vaccaro, 411 So.2d 415, 424 (La.1982) (citing State v. Adams, 394 So.2d 1204 (La.1981); State v. Williams, 385 So.2d 214 (La.1980); State v. Felde, 382 So.2d 1384 (La.1980); State v. Sonnier, 379 So.2d 1336 (La.1979), on rehearing 379 So.2d 1368 (La.1980)). Whether the defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. Id.
Both this court and the United States Supreme Court have instructed that the defendant cannot meet his burden merely by showing that there exists public *15 knowledge of the facts surrounding the offense or the alleged offender. Dobbert v. Florida, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977); Irvin v. Dowd, 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961); State v. Hart, 96-0697, p. 6 (La.3/7/97), 691 So.2d 651, 655; State v. Comeaux, 514 So.2d 84, 90 (La.1987). As the Supreme Court noted in 1961, "[i]n these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity...." Irvin, 366 U.S. at 722, 81 S.Ct. at 1642. Therefore, the defendant must prove more than mere public knowledge or familiarity with the facts of the case to be entitled to have his trial moved to another parish; rather, the defendant must show the extent of prejudice in the minds of the community as a result of such knowledge or exposure to the case before trial. State v. Wessinger, 98-1234, p. 7 (La.5/28/99), 736 So.2d 162, 172; State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 814-15.
We have recognized, though, the inherent difficulty of presenting direct evidence of community-wide prejudice against a defendant and acknowledged that positive proof of such prejudice is not always available. Rudolph, 332 So.2d at 809. Therefore, on review of a denial of change of venue, this court and the United States Supreme Court primarily inquire as to the scope and nature of publicity to which prospective jurors in a community have been exposed and examine the lengths to which a court must go to impanel a jury that appears to be impartial, in order to ascertain whether prejudice existed in the mind of the public which prevented the defendant from receiving a fair trial. See, e.g., Murphy v. Florida, 421 U.S. 794, 802-03, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975), State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542.
The seven factors enumerated by this court in Bell facilitate a court's inquiry into the nature and scope of publicity disseminated in the community where a crime occurred. This court in State v. David also distinguished extensive media coverage that is primarily factual in nature from that which is attended by inflammatory factors, such as racial strife, murder of a law enforcement officer, or an egregious event such as a televised confession. 425 So.2d at 1247. The United States Supreme Court has also cautioned that courts must distinguish largely factual publicity from that which is invidious or inflammatory, as they present real differences in the potential for prejudice. Murphy, 421 U.S. at 800, 95 S.Ct. at 2036, n. 4.
Additionally, this court and the United States Supreme Court have often examined the number of jurors excused for cause for having fixed an opinion as another gauge of whether prejudice exists in the public mind. Murphy, 421 U.S. at 803, 95 S.Ct. at 2037-38; State v. Wessinger, 98-1234, p. 7 (La.5/28/99), 736 So.2d 162, 173. The Supreme Court reasoned that in a community where the majority of prospective jurors will openly admit to a disqualifying prejudice, the reliability of other jurors' assurances that they are impartial and have no preconceived notion may be drawn into question. Murphy, 421 U.S. at 803, 95 S.Ct. at 2037. The Court went on to reason that this is because it is more likely that those jurors who claim impartiality are part of a community hostile towards the defendant and therefore they may have been influenced by the community feeling, even if unwittingly. Id. Yet, the Court also warned that:
"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without *16 more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."
Id. at 800, 95 S.Ct. at 2036 (quoting Irvin, 366 U.S. at 723, 81 S.Ct. at 1642).
As these cases demonstrate, there is not a bright line test for determining the degree of prejudice existing in the collective mind of the community. There is no established minimum level of exposure to negative publicity or percentage of challenged jurors that illustrates a corruptive atmosphere mandating venue transfer. Hoffman, 768 So.2d at 555; Wessinger, 736 So.2d at 173. Therefore, this court has advised analyzing the question of whether a change of venue was required due to the number of prospective jurors whose ability to be impartial had been corrupted by publicity by comparison to other cases.[8]Wessinger, 736 So.2d at 173.
In the present case, the court's inquiry as to whether a change of venue was necessary due to the alleged prejudice existing in the collective mind of the community is limited to a review of voir dire of the prospective jurors as the defendant never presented any evidence as to the scope and nature of the allegedly prejudicial pre-trial publicity.[9] Although the record reveals that a great majority of the venire had been exposed to some kind of publicity surrounding the case (110 out of 113), no direct evidence was admitted to demonstrate the prejudicial or inflammatory nature of the publicity to the court. When specifically asked whether the publicity they had seen was positive or negative, many of the jurors responded it was negative; yet, neither the court nor counsel inquired as to what the jurors meant by "negative". Further, when a couple of jurors were questioned more closely on the issue, several stated that the publicity had been mainly factual in nature and that the media had simply reported the facts surrounding the crime, the arrests, and the outcome of the co-defendant's trial.
*17 As previously discussed, nearly every potential juror had been exposed to some publicity surrounding this case, with approximately 89% of them having been exposed to information on more than one occasion or in multiple sources. Approximately 40 of the 113 jurors questioned[10] (35%) admitted having developed negative feelings or opinions about the defendant at some point preceding her trial due to all of the publicity surrounding the case and her co-defendant's conviction. Seventy-seven people were excused for cause. Approximately 17 out of those 77 were excused because they expressed an inability to put aside a pre-conceived disposition or outside information and be impartial toward the defendant. An additional 19 of the prospective jurors who were excused in part because they opposed the death penalty also indicated that they had pre-formed opinions regarding the case which would prevent them from being impartial.
While these numbers are significant, it is important to note that nearly all of the potential jurors who expressed that they had formed any pre-conceived opinions about the defendant were excused either for cause or upon challenge by defense counsel. Further, the majority of those prospective jurors who stated they had developed a negative feeling or opinion from the publicity to which they were exposed, expressed to the court that they would be able to put those feelings aside and fairly evaluate whatever evidence was presented at trial.
Out of those selected to serve on the jury, only one person, Juror Bartley, had expressed having had an initial negative opinion regarding the defendant's guilt due to the publicity immediately following the occurrence of the crime. Ms. Bartley, however, stated before the court that she no longer held that opinion and would be able to fairly evaluate the evidence in order to determine if the state had proved its case beyond a reasonable doubt.
While the record demonstrates that there was extensive knowledge within the community about the case in general, the defendant has failed to present sufficient evidence of an overriding prejudice within the community's collective mind that prevented her from receiving a fair trial. Most jurors responded that they were aware of the case, that the publicity they recalled was negative, but that they would be able to put aside that information and act impartially as a juror. Those jurors who expressed a pre-conceived negative opinion concerning the defendant's role in the crime that could not be put aside were excused for cause. Those prospective jurors only made up approximately 20% to 25% of the total venire.[11] These percentages are not so high or outrageous as to justify any presumption of community-wide prejudice. Additionally, as discussed earlier, there was no direct evidence before the court as to the allegedly inflammatory nature of the pre-trial publicity. In conclusion, we do not find that this is a case in which the trial judge abused his discretion in denying a change of venue.

Challenges for Cause
In assignments of error numbers eleven and twelve, the defendant argues that the trial court erred by denying the defense *18 challenges for cause as to potential jurors McDermott and Kutcher. Defendant argues that trial court abused its discretion in not excusing Mr. McDermott, an attorney, because, during voir dire, he stated that, while he had formed some negative opinions from the information he had read in the newspaper, he was "trained" to put aside such prejudice and focus on the evidence. As to Ms. Kutcher, the defendant points to her statements that she had negative feelings against the defendant because of publicity surrounding the case.
The trial court is vested with broad discretion in ruling on challenges for cause, and its ruling will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. State v. Robertson, 92-2660, p. 4 (La.1/14/94), 630 So.2d 1278, 1281; State v. Cross, 93-1189, p. 7 (La.6/30/95), 658 So.2d 683, 686. When a potential juror forms an opinion of the defendant's guilt that is derived from news publicity, the trial court should grant the defendant's challenge for cause of the prospective juror unless the "`juror declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence.'" State v. Smith, 491 So.2d 641, 646 (La. 1986) (quoting La.Code Crim.Proc. art. 797(2)).
A trial court's refusal to excuse a prospective juror for cause is not an abuse of discretion, even when the juror has expressed an opinion seemingly prejudicial to the defendant, if the juror, upon further inquiry or instruction, demonstrates that he or she is willing and able to decide the case impartially and according to the law. Robertson, 630 So.2d at 1281; Cross, 658 So.2d at 687; State v. Copeland, 530 So.2d 526, 534 (La.1988). A juror need not be totally ignorant of the facts involved with the case. State v. Harper, 430 So.2d 627, 636 (La.1983). If a juror who has acquired knowledge about the case through the media can sufficiently lay aside his or her impression of the defendant's guilt or innocence and render a verdict based on the evidence presented, he or she is competent to serve as a juror. Id.
Both potential jurors challenged in the defendant's assignments of error consistently affirmed their ability to put aside any negative impressions or opinions they had formed as a result of the publicity and decide the case fairly and impartially. Regarding potential juror McDermott, the defendant argues that the trial judge erred in not excusing Mr. McDermott because during defense questioning it emerged that he had been exposed to publicity about the case from reading the newspaper and had formed a negative opinion as a result. However, Mr. McDermott also stated that, "while I may have an opinion of this moment, I would base my decision on the evidence presented." He also stated that "I do not have an opinion that would bias me in the performance of my duty as a juror." The record further reveals Mr. McDermott's ability to serve as an impartial juror:
COURT: And, you mentioned that you had an opinion about it?from all that readingat on point. And, I think it is a proper question of whether or not it was a negative opinion or not ...
JUROR: Upon reading the newspaper, I have a negative opinion.
COURT: Okay. Can you put that opinion aside at this time and view the evidence and make you decision solely on the evidence?
JUROR: Yes.
Accordingly, it does not appear that the judge erred in denying the challenge for cause.
*19 With respect to potential juror Ms. Kutcher, defendant points to the following exchange:
DEFENSE: Have you heard about this on the news?
JUROR: Somewhat.
DEFENSE: Have you seen anything positive about Ms. Frank on the television?
JUROR: No.
DEFENSE: And, have you had conversations with either friends or associates or family members about this case?
JUROR: Some.
DEFENSE: And, were all of those conversations negative in reference to Ms. Frank?
JUROR: I'm sure they were, pretty much.
DEFENSE: Okay. I want to ask you, can you remember hearing anything positive about Ms. Frank as a result of what you have seen from the reports and the discussions with those people?
JUROR: No.
DEFENSE: And, do you come here today with no opinion as to her guilt or innocence?
JUROR: I wouldn't say that I don't have an opinion, but I will say that I would have to listen to the evidence presented here to make any decision as to that.
DEFENSE: But, you have negative feelings, and those negative feelings stem directly from what you have heard about this case?
JUROR: Yes.
However, defense counsel fails to cite to the state's questioning of Ms. Kutcher in which she answered that she could put the publicity out of her mind and listen to the evidence presented in the courtroom. Ms. Kutcher additionally stated:
I have negative feelings, but what I think and what the facts are as presented in Court, you know what happens here as far as the evidence goes, I know the rules are that she [defendant] doesn't have to do anything. It is his [prosecutor's] job to prove it ... And, I don't think that what I think would be biased at all with what I heard about before this. I would make a rational decision.
Thus, the trial judge did not err in denying the challenge for cause. Ms. Kutcher, although expressing some reservations initially, stated that she could be fair and decide the case solely on the evidence presented in the courtroom.
Both Mr. McDermott and Ms. Kutcher initially expressed that they had developed some negative opinions about the defendant. However, both also demonstrated that they could be fair and decide the case solely on the evidence presented in the courtroom. Therefore, these assignments of error lack merit.

Incomplete Record
In this assignment of error, the defendant claims that her right to a full and fair review on direct appeal has been violated because the record is incomplete.
Article I, § 19 of the Louisiana Constitution guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." Material omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal. See State v. Robinson, 387 So.2d 1143 (La.1980) (reversal required when record failed to contain the testimony of a state and defense expert witness); State v. Ford, 338 So.2d 107 (La.1976) (reversal required when record was missing *20 the testimony of four state witnesses and the voir dire of prospective jurors). On the other hand, inconsequential omissions or slight inaccuracies do not require reversal. See State v. Goodbier, 367 So.2d 356, 357 (La.1979) (reversal not required when record does not include a transcript of the voir dire examination and affidavit of court reporter indicated that counsel made no objections during voir dire). Finally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773 (citing State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473).
As an initial matter, we recognize that the court itself has had its doubts about the completeness of the record in this case at times. However, as discussed earlier, only one transcript of a proceeding that took place on September 1, 1995, was found to be missing and to contain material information regarding the defendant's argument on indigency. See n. 2. Because the court obtained that transcript and, in part, based its determination that the defendant was in fact indigent on the information contained in that transcript, the defendant can hardly claim she was prejudiced by its initial absence from the record.
Further, regarding the indigency issue, defense counsel points out in this assignment of error that there is no transcript of a hearing held after the defendant's trial where the trial judge apparently found that the defendant was indigent for purposes of her appeal. The only reference in the record to this hearing is the trial judge's statement on March 15, 1996, that, "we had a full hearing as to whether or not Antoinette Frank or her mother had any funds.... I questioned the mother under oath." We agree that it would have been helpful to have had a transcript of that hearing. However, the court already considered the fact that the defendant was later found indigent without any apparent change in circumstances and held that the judge abused his discretion in not earlier declaring her to be indigent. Therefore, again, the defendant was not prejudiced by this omission from the record.
The other dates of which defense counsel complains of the lack of transcription include many days during which no testimony was taken and no argument was heard by the trial court. On none of the days complained of, other than the post-trial hearing discussed above, did any proceeding material to the defendant's appeal take place. Therefore, those omissions do not constitute reversible error.[12]

Conclusion
The defendant's conviction is affirmed. However, the case is remanded to the trial court in order for it to hold an evidentiary hearing as to whether the defendant was entitled under Touchet to state-funded expert assistance for the sentencing phase of *21 her trial. If the court determines she was so entitled, it is to vacate the defendant's sentence and order a new penalty phase at which the defendant will have the benefit of that expert assistance. If the trial court finds that the defendant can not make the proper showing of need for state funds, the defendant may appeal that decision to this court along with the other assignments of error regarding the penalty phase of her trial.
NOTES
[1] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[2] Upon the court's initial review of the transcript of the August 29, 1995, hearing, it was the court's belief that the defendant had moved for and had been denied indigent status at some earlier hearing, although there was no transcript of any other hearing on the matter. This belief was based on transcribed statements made by the court and defense counsel at that hearing referring to a previous motion and on the fact that the defendant had filed a writ application with this court in July, 1995, seeking review of the trial court's refusal to find her indigent. This court therefore entered an order on November 13, 2000, that the trial court confirm that there was such a hearing and, if there had been one, provide this court with a supplemental transcript of that earlier proceeding. The trial court responded on November 27, 2000, that there had been no other hearing on the defendant's indigent status prior to August 29, 1995.

Additionally, when the trial court submitted its per curium on November 27, 2000, it also provided this court for the first time with a partial transcript from a hearing on September 1, 1995, at which the defendant's indigent status was again discussed. This court subsequently obtained a full transcript of that proceeding on November 29, 2000. This is only one example of the abysmal condition of the record in this case when it was turned over to this court for review and to what lengths the court has had to go to obtain all transcripts relevant to this proceeding. Despite the court's diligent efforts from the beginning to obtain a full record, it discovered at the late date of November 27, 2000, that a transcript of an important proceeding was still missing.
The trouble the court has faced in obtaining the whole record in this case unnecessarily delayed its ability to thoroughly and expeditiously review the case. However, we do not anticipate facing this problem again, as the Rules of the Supreme Court were recently amended to provide that in all capital cases, "[t]he district judge in the court in which the case was tried ... shall certify that the record conforms to the requirement of this section [that the record contain complete transcripts of all proceedings] before it is lodged in this Court." La. Rules of Court (A)(I)(6)(e) (emphasis added).
[3] The following day, the court also ruled that the defendant would have to pay for all transcripts and photographs after having investigated the defendant's retirement funds. The Court stated:

Mr. Jenkins, I have determined that there is some three-thousand dollars plus that is in the retirement fund for Ms. Antoinette Frank. Those monies should be secured and they are to pay for transcripts, the transcript today and the transcript that was done over the weekend. Those moniesI have asked Mr. Hand who is a member of that Board to explain the way that that money is to go directly to these Court Reporters for the numbers of transcripts that they have had to do at your request. So there will be no free transcripts.
[4] At the August 29, 1995, hearing on the defendant's indigent status, defense counsel also verbally asked the court to consider the defendant indigent so she could hire a crime scene expert. On September 1, 1995, the district attorney stated for the record that it was his understanding that the defendant was seeking state funds in part for a blood spatter expert. However, the defendant's application to the trial court for an ex parte hearing on her motion for funds for expert assistance did not include a request for a crime scene expert. Her application specifically requested funds for a psychiatrist/psychologist for trial and sentencing and a mitigation expert for the penalty phase only. Further, on appeal, the defendant's argument focuses on the denial of funds for psychiatric and mitigation expert assistance during the penalty phase of the trial. There was no argument raised as to the defendant's need for a crime scene expert or that the defendant was prejudiced by the lack of one at trial.
[5] In response to the defendant's request for state-funded psychiatric expert assistance, the state has made much of the fact that the defendant refused to be examined pre-trial by a lunacy commission. However, we do not agree with the state's position that the defendant's refusal to cooperate with a court-appointed psychiatrist for the purpose of determining whether she was competent to stand trial, when she testified for the record that she believed she was competent, means that she would not cooperate with any other evaluation for purposes of presenting mitigating evidence.
[6] While the United States Supreme Court has not specifically answered the question of what constitutional standard of review applies to a trial court's denial of state funds for expert assistance in an indigent's defense, many of the federal circuit courts apply a harmless error standard. See, e.g., Tyson v. Keane, 159 F.3d 732 (2nd Cir.1998), cert. denied, 526 U.S. 1027, 119 S.Ct. 1270, 143 L.Ed.2d 365 (1999); Tuggle v. Netherland, 79 F.3d 1386, 1392-93 (4th Cir.1996), cert. denied, 519 U.S. 894, 117 S.Ct. 237, 136 L.Ed.2d 166 (1996); Brewer v. Reynolds, 51 F.3d 1519, 1529 (10th Cir.1995), cert. denied, 516 U.S. 1123, 116 S.Ct. 936, 133 L.Ed.2d 862 (1996); Starr v. Lockhart, 23 F.3d 1280, 1291-92 (8th Cir. 1994), cert. denied, 513 U.S. 995, 115 S.Ct. 499, 130 L.Ed.2d 409 (1994).
[7] Louisiana courts also recognize that in unusual circumstances prejudice against the defendant may be presumed. State v. Brumfield, 96-2667 (La.10/20/98); 737 So.2d 660, 677; State v. David, 425 So.2d 1241, 1246 (La.1983). This exception to the general rule that the defendant must prove actual prejudice evolved from a series of United States Supreme Court cases in which the Court found that the defendant was denied due process regardless of whether he had demonstrated "isolatable prejudice". In those cases, the Court held that the pervasive and inflammatory nature of publicity to which the community had been exposed and/or the procedure employed by the state involved such a high probability that the accused would be prejudiced, that the whole procedure had to be deemed lacking in due process. See, e.g., Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (holding that it was a denial of due process to refuse the request for a change of venue after the people of the parish had been exposed repeatedly and in depth to the spectacle of the petitioner personally confessing in detail to the crimes for which he was later tried); Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (finding denial of due process because of the "virulent and incriminating publicity" about the defendant, the notorious nature of the case, the televised interview of the defendant, and the "carnival atmosphere" of the trial, at which "bedlam reigned" due to the trial judge's unprecedented allowance of the press to have free reign over the courtroom).

Relying on Supreme Court precedents, this court articulated the extraordinary standard for presuming prejudice in State v. David, where it stated that:
Although extensive knowledge in the community of either the crimes or the putative criminal and his prior crimes is not in itself sufficient to render a trial constitutionally unfair, unfairness of a constitutional magnitude will be presumed in the presence of a trial atmosphere which is utterly corrupted by press coverage or which is entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of the mob.
425 So.2d at 1246 (citing Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); Rideau v. Louisiana, supra; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Sheppard v. Maxwell, supra).
[8] For examples of other cases relying on this method of analyzing the question of possible community prejudice, see State v. Connolly, 96-1680, p. 5 (La.7/1/97), 700 So.2d 810, 815 (although 86.33%, 120 out of 139, potential jurors possessed some knowledge about the crime, most had only a vague recollection of the surrounding facts); State v. Wilson, 467 So.2d 503, 513 (La.1985) ("Although a majority of prospective jurors (i.e., 24 of 39) admitted exposure to pretrial publicity, only four were excused for cause on ground of their formation of a fixed opinion.... A review of the responses by potential jurors on voir dire does not reveal the existence of collective community prejudice which could have denied defendant a fair trial before impartial jurors."); State v. Clark, 442 So.2d 1129, 1133 (La.1983) (motion for change of venue granted based on dry run voir dire in which 37 of 38 jurors recalled details of crime and only six out of 24 jurors in the last two groups questioned indicated that their knowledge would not affect their decision); State v. David, 425 So.2d at 1247 (out of 112 jurors, 27 had read or heard about the case, but only six of those 27 had an opinion, and all four of those jurors who said that they could not put their opinion aside were excused for cause); State v. Rodrigue, 409 So.2d 556, 559 (La. 1982) (in a mock voir dire set up in order to determine the impact of media coverage by the court, 26 of 30 prospective jurors had read about the case, but only nine had fixed an opinion which satisfied the court that a jury could be chosen in that parish).
[9] In many of the cases that have been before this court on review of the same issue, the defendant entered into evidence video tapes of news broadcasts, logs of when reports were televised, and copies of the various newspaper articles reporting on the crime, which enabled the court to make a more informed inquiry as to possible prejudice. Nothing of that nature was presented to the court in this case.
[10] Only 113 people of the original 125 person venire were questioned because a 12 person jury and 2 alternates were selected before the last panel of potential jurors was questioned.
[11] These numbers reflect that 17 out of 113 jurors were excused solely because they had a preconceived notion regarding the defendant's guilt. An additional 19 people who were excused for opposing the imposition of the death penalty also admitted having developed a negative opinion of the defendant as well.
[12] We also note that the defendant filed two motions with this court on December 1, 2000, requesting supplementation of the record with transcripts of certain proceedings at which the defendant's indigent status was discussed and a request to file a supplemental brief regarding the indigency issue after receiving those supplemental transcripts. These motions were filed as a result of this court's order to the trial court to provide a transcript of any hearing on indigent status that took place before August 29, 1995, and the trial court's response in a per curiam to which it attached a page from a transcript that had not previously been provided to this court. See note 2. However, as discussed above, the court has fully considered those missing transcripts and has ruled in the defendant's favor on the indigency question. Therefore, the motions for supplementation of the record and a supplemental brief are rendered moot by our holding.