JOAN BERNARD ARMSTRONG, Chief Judge.
| í STATEMENT OF CASE
On January 17, 2007, the State charged the defendant, Leroy Massey, with two counts of the attempted first-degree murder of Travis Bonvillian and Joshua O’Quinn. The defendant entered a plea of not guilty at his arraignment on January 24, 2007. On February 8, 2007, the court denied the Motion to Suppress the Identification and found probable cause. On May 9, 2007, the State filed its Prieur notice. Following a hearing on June 22, 2007, the trial court took the matter under advisement. On August 8, 2007, the defense filed a Memorandum in Opposition to the State’s request to introduce evidence of other crimes. On August 16, 2007, the trial court denied the State’s motion to introduce evidence of other crimes. Trial in this matter began on September 5, 2007. On September 10, 2007, the jury found the defendant guilty on both counts of attempted first degree murder. At that time, the court ordered a pre-sentence investigation and set sentencing for November 16, 2007. The defendant was subsequently charged as a multiple offender based on a prior conviction for possession of cocaine. The defendant entered a not guilty plea |2to the multiple bill. At the November 16, 2007, sentencing hearing, the defendant pled guilty to being a multiple offender and waived all delays. The trial court sentenced the defendant to thirty years without benefit of probation, parole, or suspension of sentence on each count with the sentences to run concurrently. On May 22, 2009, the court granted the defendant’s motion for out-of-time appeal.
STATEMENT OF FACT
Police Dispatch Supervisor Janell Jones testified that her job responsibilities include the operation of the NOPD Communications Division which involves receiving and monitoring 911 calls. Ms. Jones is also the custodian of the 911 call tapes. Ms. Jones identified the incident recall sheet and the 911 tape incident to this matter.
Trauma surgeon Dr. Allen Marr testified that on September 16, 2006, he treated the victims, Travis Bonvillian and Joshua O’Quinn, at Elmwood Trauma Center. Mr. Bonvillian arrived at the trauma center in stable condition with no life threatening injuries. However, he did suffer four wounds — one in each buttock, one in his back and one to his side. One bullet remains lodged in Mr. Bonvillian’s body. Mr. O’Quinn, on the other hand, suffered *810 major blood loss — seven pints of blood-from his wounds-large entrance and exit wounds on his left side and also a wound in his back. The gunshot injuries caused Mr. O’Quinn to lose both his spleen and his left kidney and endure several hours of surgery. Rating the severity of Mr. O’Quinn’s injuries on a scale of one to ten, Dr. Marr assigned an eight to his condition. Blood tests for alcohol on both victims proved negative.
| .¡Officer John Blatcher testified that on September 16, 2006, at approximately 5:00 p.m. he responded to a complaint of aggravated battery by shooting in the 600 block of Pacific Street. As the first officer on the scene, he noted that the front of the house was riddled with bullet holes and the front door to the house was partially open. He observed several AD-47 and 9 millimeter bullet casings on the ground and a trail of blood from the front to the rear of the shotgun house into the back yard where he located the two victims. The officer identified photographs of the house and backyard where the victims were located. Both victims told Officer Blatcher that they had just returned to the house from a trip to the grocery store when an unknown 5' 9" black male with an assault weapon ambushed them as the victims walked up the steps to the house. One of the victims said that the assailant was dressed in black with a cap on his head. The other victim related that the assailant ordered them not to enter the house. However, when the victims ran into the house, the assailant started shooting.
Mr. Wayne Hebert, who lives in the 600 block of Pacific across the street from the Bonvillian residence, testified that at the time of the shooting he was at his home watching television when he heard gunshots. Prior to the shooting, he noticed three black males walking across the street near the Bonvillian residence. After the shooting, Mr. Hebert looked out his front door and noticed the assailants running from the area still shooting in the direction of the Bonvillian residence.
Don Bonvillian, Jr., Travis Bonvillian’s brother, stated that he arrived at his home on Pacific Street on the day of the shooting to find his brother, Travis, and 14Joshua O’Quinn at the home. Approximately five minutes after his arrival, Don entered the kitchen and Travis and Joshua left the house to purchase beer. Approximately ten minutes later, Don heard gunfire in front of the house. Don ran to the front of the house and found both Travis and Joshua on the ground bleeding heavily. Don moved both of the victims from the house and into the backyard for safety. Someone called 911. The police arrived about seven minutes later.
Detective Mark McCord testified that he was the lead detective investigating this double shooting on Pacific Street on September 16, 2006. By the time McCord arrived on the scene, EMS personnel were ready to transport the victims to the hospital. McCord identified fifteen assault rifle shell casings fired from two different weapons. The detective spoke with Don Bonvillian on the day of the incident and to Wayne Hebert a few days later. He was unable to speak to the victims for several days after the shooting. When McCord interviewed the victims, they both described the assailant as 5' 9" to 5' 11" in height, about 150 pounds, with a thin build, a dark complexion, between twenty to twenty-five years of age with dreadlock style braids. McCord also learned that the shooter was clothed in black with a cap and black gloves. Joshua O’Quinn gave McCord a newspaper photograph of the defendant and identified him as the shooter. McCord presented both victims with six person photo lineups from which the victims identified the defendant as the per *811 son who shot them. McCord prepared an arrest warrant for the defendant.
1 sTravis Bonvillian testified that on the day of the shooting, Joshua O’Quinn arrived at the Bonvillian residence at about 4:80 p.m. The two visited with family members in the house for a few minutes and then left to purchase beer. When the pair returned to the residence, Travis walked to the door, followed by O’Quinn, and heard someone shout “Don’t shut the door, you m-f-.” Travis turned toward the person who shouted at him and at that moment saw the person point a gun at him. Travis ran into the house with O’Quinn behind him at which time gunfire brokeout. Travis described the shooter to the police as a black male with a “chi-wee” hair style, dressed in black and carrying an assault rifle. Travis was shot four times as he ran through the house out into the backyard. His injuries necessitated surgery and a three-day stay in the hospital. Several days after the shooting, Travis visited O’Quinn who showed Travis a picture from the newspaper. Travis recognized the photo as a picture of the defendant, the man who shot him. Shortly after his visit with O’Quinn, Travis viewed a photo lineup presented to him by Officer McCord. Travis identified the defendant from the photo lineup but was only 50 to 60% positive of the identification.
Joshua O’Quinn testified corroborating Travis Bonvillian’s recounting of the facts up to the time of the shooting. Joshua added that when he and Travis parked in front of the Bonvillian residence, there was no one else on the street. However, as he held the front door for Travis, Joshua heard a noise which attracted his attention. He turned to see the defendant walking quickly toward him brandishing an assault rifle. The defendant shouted, “Don’t shut that f- door.” Joshua and ftTravis made it into the house, and Joshua slammed the door behind them. The defendant sprayed bullets into the front of the house and into the hallway leading to the rear yard of the residence. A few seconds after closing the door, Joshua was shot in the back. Joshua got up and ran out the rear of the house into the yard where he slumped into a chair and found Travis sprawled on the ground. The police arrived minutes after the shooting stopped. While Joshua was recovering from his injuries, he noticed the defendant’s picture in the newspaper. In a subsequent conversation with Detective McCord, Joshua informed the detective that he had seen the defendant’s picture in the newspaper. Detective McCord compiled a six man photo lineup from which Joshua unequivocally identified the defendant as the shooter.
ERRORS PATENT
A review for errors patent on the face of the record reveals one error. The bill of information is missing from the record. According to State v. Buttner, 411 So.2d 35 (La.1982), this constitutes an error patent. However, in State v. Mitchell, 553 So.2d 915 (La.App. 4th Cir.1989), this Court found that a record lacking a bill of information was harmless error, where, as in the instant case, the defendant made no complaint that he was unable to properly defend himself, and the docket master indicated that the bill of information had been filed.
In this case, although the bill of information is not included in the record, the docket master indicates that the defendant waived the reading of the bill of information at his arraignment. Additionally, the trial transcript reveals that at the 17beginning of trial, the trial judge read the bill of information to the jury in the defendant’s presence. There is no indication that defendant was unaware that he was charged with two counts of attempted *812 first-degree murder. Furthermore, the defendant has not alleged any prejudice because of absence of the bill of information from the record herein.
ASSIGNMENT OF ERROR
In his sole assignment of error, the defendant argues that his right to appellate review based on a complete record guaranteed under Art. 1, sec. 19 of the Louisiana Constitution has been violated because of trial record deficiencies. Specifically, the defendant contends that the record does not contain any trial or pretrial minute entries or a transcript of the arraignment proceedings, nor does it contain various motions and pleadings filed into the record, including the bills of information charging him with attempted first degree murder and as a multiple offender, Motion to Suppress Identification, Prieur notice, trial memoranda, and witness list. Consequently, the defendant argues that his conviction must be reversed.
La. Const. Art. I, § 19 provides that “[n]o person shall be subjected to imprisonment .,. without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.... ” La.C.Cr.P. art. 843 requires, in all felony eases, the recording of “all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of | scounsel.” As a corollary, La. R.S. 13:961(C) provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the proceedings required. A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel. State v. Landry, 97-0499, p. 3 (La.6/29/99), 751 So.2d 214, 215.
In State v. Frank, 99-0553, p. 21 (La.1/14/01), 803 So.2d 1, 19-20, the Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. First, “[mjaterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal.” 99-0553 at pp. 20-21, 803 So.2d at 19-20, citing State v. Robinson, 387 So.2d 1143 (La.1980)(re-versing given that testimony of a state and defense expert witness was missing); State v. Ford, 338 So.2d 107 (La.1976)(finding omissions material, given that substantial portions of the record were missing, including the testimony of four state witnesses, voir dire examination of prospective jurors, and the prosecutor’s opening statements); see also State v. Bright, 2000-1255, p. 8 (La.App. 4 Cir. 2/6/02), 809 So.2d 1112, 1117 (finding record inadequate, given “[t]he cumulative effect of the missing portions of testimony of the defendant and other material witnesses, and the frequency of ‘inaudible’ and ‘spelled phonetically’ in the transcript”); State v. Diggs, 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104, citing Ford, supra, (finding the unavailability of an officer’s complete testimony necessitated a new trial because it could not be determined whether the IflHiissing testimony was substantial or inconsequential). Second, “inconsequential omissions or slight inaccuracies do not require reversal.” Frank, supra, citing State v. Goodbier, 367 So.2d 356, 357 (La.1979) (declining to reverse when record did not include transcript of voir dire examination and the court reporter’s affidavit indicated that no objections were made by the attorneys during voir dire); see also State v. Lyons, 597 So.2d 593 (La.App. 4 Cir.1992) (declining to reverse when record did not include some of the jury *813 charges, transcript of voir dire, impaneling of jury or opening statement). Third, and “[fjinally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts.” Frank, supra, citing State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773. However, this court has held that under some circumstances a complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record. See, e.g., State v. Cooley, 98-0576, p. 9 (La.App. 4 Cir. 11/17/99), 747 So.2d 1182, 1187. An incomplete record may be adequate for appellate review. State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480. Finally, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts. State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773.
In this case, the defendant does not complain that any portions of the trial proceedings are omitted from the record. The full transcript of the trial is part of the appellate record. Rather, defendant claims that minute entries reflecting trial | inand pretrial activity and various pretrial pleadings, including Bills of Information, Motion to Suppress, Prieur notice, trial memoranda, and witness list, are missing from the record. He does not argue that there was a basis to suppress the identifications, nor does he allege a basis exists for a motion for new trial.
In this case, the two victims testified at trial. They made positive pre-trial identifications of the defendant and each testified that he was certain the defendant shot at them because of the length of their view of, and close proximity to, the defendant during the incident. The victims supplied the police with identical physical and clothing descriptions of the defendant. One of the victims unequivocally and immediately identified the defendant from a photographic lineup, which he viewed independently of anyone but the investigating officers. Moreover, the victims emphatically testified that they were neither influenced nor coerced to identify the defendant’s picture. Moreover, Detective McCord’s trial testimony corroborated that the victims’ identifications of the defendant were independent and untainted by suggestion or coercion.
Given that the missing portions of the trial record in this case are not evidentia-ry, coupled with the defendant’s failure to make a showing of prejudice based on the missing portions of the record and the overwhelming evidence of the defendant’s guilt, the missing portions of the record of these proceedings is inconsequential and does not warrant a reversal of the defendant’s conviction. This assignment has no merit.
_JiiiFor the foregoing reasons, the defendant’s conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.