426 So.2d 1329 (1983)
STATE of Louisiana
v.
Charles PIKE.
No. 82-KA-1421.
Supreme Court of Louisiana.
January 21, 1983.
*1330 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Kay Kirkpatrick, Thomas C. D'Amico, Louis Daniel, Asst. Dist. Attys., for plaintiff-appellee.
Ronald Causey, Richard McGimsey, Baton Rouge, Robert B. Schambach, Metairie, for defendant-appellant.
DIXON, Chief Justice.
Defendant, Charles Pike, was charged by bill of information with the crime of simple burglary of an inhabited dwelling, a violation of R.S. 14:62.2. After trial by judge on December 14 and 15, 1981, defendant was found guilty as charged. A presentence investigation report was ordered, and on April 15, 1982 the court sentenced defendant to three years at hard labor, the first year to be served without benefit of probation, parole or suspension of sentence. Defendant now appeals his conviction on two assignments of error.
The evidence at trial tended to support the following version of the facts. At approximately 2:30 a.m. on November 16, 1980, Vicki Pierce was driven home after an evening out drinking with her girl friends, Darlene Gautreaux and Gail Hayden. Her friends watched her until she was inside of her house. They drove off after she waved to them and locked the door. Once inside Vicki "went straight to the bathroom, used the bathroom, came out, turned around to go into" her bedroom, and then for the first time noticed that her bedroom light was on. She did not recall leaving that light on, her habit being to leave only the living room lamp lit when she left the house.
Fearing that something was amiss, Vicki began searching the house.[1] She first noticed that the kitchen window was open and then she spotted a flashlight lying on the windowsill. Continuing her search into her bedroom, she testified: "I went into the bedroom, looked around, walked to the closetI have sliding door closetsand they were open, both slid to one side, and I walked up to the open part and looked down, you know, looked at that part first and then I looked over on the other side, and I could see some tennis shoes and pants that I didn't recognize and it appeared to be someone was stooping down in the closet. The clothes were hiding their face and stuff, but I could see the tennis shoes and the blue jeans."
She decided to try to frighten the intruder and "grabbed the clothes back and screamed in their (sic) face." After she gave "a loud scream" her next door neighbor, "Charles Pike, jumped out of the closet holding his heart and fell back on the bed and said, you scared me." Vicki testified that when she demanded to know what he was doing in her house, defendant responded *1331 first "that he thought somebody was at home," and next "that he came in to get a joint." According to Vicki, she admonished defendant, scolding him, "you just don't climb through peoples' window[s] for any reason," and then she requested that he leave the house. Defendant was slow to depart, first inviting Vicki to have a beer with him. She refused, and then questioned defendant about the flashlight in the kitchen. Defendant admitted that it was his flashlight and went to retrieve it. Vicki testified that before he would leave the house, defendant pleaded with her not to tell Mitchell Parker, her common law husband, or his wife, Cherry, about the incident. After she promised him that she would remain silent, he finally left.
Vicki locked the door and then telephoned the two girl friends with whom she had been drinking, begging them to drive back over. Her friends arrived about ten minutes later. After they calmed Vicki down, Vicki notified the police of the incident. The police investigated that night, but Vicki did not file charges against the defendant until the afternoon of November 16, 1980, when Mitchell Parker returned from a deer hunting trip. Defendant was arrested at his home on November 22, 1980.[2]

Assignment of Error No. 1
In this assignment, defendant contends that insufficient evidence was introduced by the state to establish the essential elements of the crime of simple burglary of an inhabited dwelling.
The simple burglary of an inhabited dwelling statute states, in pertinent part, that:
"Simple burglary of an inhabited home is the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in Article 60." R.S. 14:62.2.
The specific intent to commit either a felony or a theft at the time of his unauthorized entry is an essential element of the crime of burglary. State v. Jones, 426 So.2d 1323 (La.1983); State v. Marcello, 385 So.2d 244 (La.1980); State v. Anderson, 343 So.2d 135 (La.1977).
In State v. Marcello, supra at 245, this court stated:
"`Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired and prescribed criminal consequences to follow his act or his failure to act.' LSA-R.S. 14:10.
The State had to introduce at least some evidence that defendant had the active desire to commit a felony or theft in the... building."
In determining whether evidence is sufficient to support a conviction, there must be enough evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jones, supra.
Baton Rouge City Police Officer John Corkern testified that he was dispatched at 4:00 a.m. to investigate a "burglary call" at Vicki Pierce's residence. When he arrived, he found the victim distraught. Vicki informed Officer Corkern that "she had found her neighbor in her closet in her bedroom when she came home," and that he had entered the house through the kitchen window. The officer's investigation corroborated this means of entry for he observed *1332 "fresh scuff marks on the side of the wall,"[3] right below the kitchen window.
The arresting officers, Jim Normand and D. Reed, testified concerning the arrest of defendant at his home on November 22, 1980 at 11:00 a.m. and his subsequent inculpatory statement. Defendant was informed of his constitutional rights both at the time of the arrest and later at the police station. Officer Reed testified that in the police car on the way to the station, defendant admitted that "I was just in the house looking for a joint."
Darlene Gautreaux and Gail Hayden testified that Vicki "was close to hysterical" and "very upset" when they returned to her residence. As they pulled up in the driveway, Mrs. Gautreaux "noticed the shade on the back window of the house next door move. Someone was standing there watching" them. Mrs. Gautreaux stated that after they got out of the car and were walking up to the door of Vicki's house, "the man was leaning almost totally out of the window" to observe their actions. Ms. Hayden recognized the man as the defendant.
The victim's common law husband, Mitchell Parker, testified that he had been deer hunting with friends when this event occurred. Defendant knew that Parker would be away from his residence for the weekend because they visited on Friday evening, November 14, 1980, while Parker was preparing for the trip. Parker declared that he did not give defendant permission to enter his home at any time that weekend.
Responding to the accusations, defendant and his wife, Cherry Pike, insisted that the entry was not unauthorized. Defendant testified that Parker had told him on several occasions to "feel free to come over any time" and to make himself at home. These two witnesses argued that the two families had an "open house" arrangement existing between them in which not only garage tools were freely borrowed, but also cooking supplies, beer, marijuana and even Parker's truck. On direct examination defendant recalled that at the time he borrowed the truck from Parker, he was instructed by his neighbor, "if you see anything over here you want to borrow, he said, feel free to come borrow it anytime."[4]
According to defendant, he was in fact at the victim's home during the early hours of November 16, 1980, but he had entered through the unlocked front door after first knocking. Defendant testified that this was a common practice of his.[5] He walked toward the bedroom looking for Parker "because the light was on." When he discovered that no one was home, he "turned *1333 around and started to walk back toward the front door." Vicki then entered the house and asked him what he was doing there. Defendant replied that he had come over to "get a joint from Mitch." Vicki informed him that there was no marijuana in the house and so defendant left. Vicki escorted him to the front door.
The testimony of Vicki Pierce and Mitchell Parker, while not entirely inconsistent with defendant's account of the relationship between the two households, is in crucial part different. Both testified that defendant was not given permission to enter their home while they were away. Vicki also testified that the doors were locked and the windows were closed on November 16, 1980. In addition, she stated that she discovered defendant crouched in her bedroom closet.
In light of the inconsistencies borne out by the evidence, the judge acted reasonably in rejecting defendant's version of the facts. For example, at trial, defendant claimed that Vicki did not discover him in the closet; he maintained that he had entered the house through the front door and was leaving in the same manner when Vicki encountered him. However, the evidence supports a finding that defendant, "looking for a joint," entered the residence through the kitchen window rather than through the unlocked front door. The kitchen window was found wide open by the victim, her girl friends and the investigating police officer. Scuff marks were spotted near the window.
Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have decided the credibility issue in favor of the victim and her witnesses rather than the defendant, and thus concluded that defendant made an unauthorized entry into the victim's home.
In order to be convicted under R.S. 14:62.2, the defendant must have the specific intent to commit either a felony or a theft at the time of his unauthorized entry. In State v. Jones, supra, this court reversed a conviction for attempted simple burglary when the testimony showed that the defendant did not possess the requisite intent to commit a felony or theft in the house. In that case, defendant had no burglary tools in his possession, nor was there any other evidence of an intent to burglarize his neighbors' home, other than his mere presence in the house. Defendant was in need of medical attention and explained his presence in the house by saying that he wanted his neighbors to drive him to the hospital.
In the instant case the defendant admitted that he was in his neighbors' home for the purpose of looking for drugs. The state contends that the only reason defendant was present in the house was to commit a theft.
R.S. 14:67 defines theft as:
"... the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential."
The state presented ample evidence that defendant had the active desire to commit a theft in Vicki Pierce's residence. The intent to commit a theft may be inferred from the circumstances surrounding the commission of the offense. State v. Anderson, supra; State v. Robinson, 315 So.2d 268 (La.1975).
Defendant was found in the residence of the victim at approximately 2:30 a.m. The victim and her common law husband, the owner of the house, both testified that defendant was not given permission to enter their dwelling when they were not at home. The victim discovered the defendant hiding in her closet. The kitchen window was open and the defendant's flashlight was on the windowsill. Defendant admitted to the police that he was looking for a joint in the house. In addition, at trial, there was evidence that victim's jewelry box had been tampered with and a ring was missing. The police, however, were not informed of the disappearance of the ring from the jewelry box.
*1334 The trial judge did not believe the testimony of defendant that he was authorized to take items from the victim's residence without permission. Our review of the record convinces us that, viewing the evidence in the light most favorable to the state, a rational trier of fact could have found beyond a reasonable doubt that defendant entered the residence without authorization with the intent to commit a theft therein. This case is distinguishable from State v. Jones, supra, where the state produced no evidence to show that defendant had the intent to commit a theft or felony therein, other than his mere presence in the dwelling.
This assignment lacks merit.

Assignment of Error No. 2
In this assignment, defendant contends that the trial judge erred in imposing an excessive sentence in violation of Article 1, § 20 of the Louisiana Constitution of 1974.
Defendant was sentenced to three years at hard labor, the first year to be served without benefit of parole, probation or suspension of sentence.
Defendant argues that the trial court failed to comply with the sentencing guidelines set forth in C.Cr.P. 894.1 by ignoring the mitigating factors present in this case: defendant's status as a first offender, no prior arrest record, three years of college, seven years of active United States Army duty with an honorable discharge, a stable three year marriage, two minor children, and a good employment record.
Defendant's sentence is one-quarter of the maximum sentence of twelve years that could be imposed for the crime of simple burglary of an inhabited dwelling. R.S. 14:62.2. Nevertheless, even when a sentence is within the statutory limits, it may be reviewed by this court for excessiveness. State v. Sepulvado, 367 So.2d 762, 769-770 (La.1979):
"By reason of the constitutional prohibition against excessive sentences provided by Article 1, Section 20, the sentencing judge does not possess unbridled discretion to impose a sentence within statutory limits, regardless of mitigating facts...."
"La.C.Cr.P. art. 894.1 (1977) sets forth three factors which justify a sentence imposing imprisonment, and eleven other factors which tend to indicate suspension of sentence or probation as appropriate.[6] The statute provides that the latter, `while not controlling the discretion of *1335 the court, shall be accorded weight' by the trial court in its sentencing decision. The enactment concludes that the trial court `shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence.'" State v. Cox, 369 So.2d 118, 120-121 (La.1979).
The factors guiding the decision of the trial judge are necessary for this court to adequately review a sentence for excessiveness and therefore should be in the record. Otherwise, a sentence may appear to be arbitrary or excessive, and not individualized to this particular defendant. State v. Brown, 412 So.2d 998 (La.1982); State v. Cox, supra. When the reasons for an apparently severe sentence in relation to the particular defendant and the actual offense committed do not appear in the record, a sentence may be vacated and remanded for resentencing. State v. Jackson, 360 So.2d 842 (La.1978). If the judge records the factors affecting his sentencing decision, the sentence should not be set aside as excessive unless it is grossly disproportionate to the offense or represents nothing more than the needless infliction of pain and suffering. State v. Brown, supra; State v. Bonanno, 384 So.2d 355 (La.1980).
In this case the trial judge failed to "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." C.Cr.P. 894.1. The trial judge failed to note any mitigating circumstances in the record, other than merely mentioning defendant's first offender status and his age of thirty-one years. In sentencing defendant, the trial judge was clearly not unsympathetic to his plight, noting that:
"The statute mandates that the first year of any sentence would be without benefit [of probation, parole or suspension of sentence][7] so I've got to lock you up for at least one year ... though I am reluctant I plan to do it because I certainly don't want to follow in your footsteps having to say that I disobeyed knowingly the law. Therefore, it is the sentence of this court Mr. Pike that you be committed to the custody of the Louisiana Department of Corrections in accordance with Revised Statutes Title 15, Section 824 and confined at hard labor, the first year of which to be served without benefit. That simply means the second two years you can parole. The first year you have got to serve."
As the record stands, the sentence is apparently excessive. The trial judge failed to adequately comply with C.Cr.P. 894.1. The record does not contain an adequate explanation or justification for a three year sentence. The case must be remanded for resentencing and compliance with C.Cr.P. 894.1.
For the reasons assigned, the conviction is affirmed, but the sentence is vacated and the case is remanded to the district court for sentencing of the defendant according to law and consistent with the views herein expressed.
LEMMON, J., concurs.
NOTES
[1] Vicki testified that she remained in the house, even though she "felt something was wrong," since she "didn't have a car" and she "didn't really know the neighbors that well."
[2] The reason for the arrest on this day was explained at trial as follows:

`Q. Was there anything, any particular reason why you didn'tthat you waited several days before you arrested him?
A I'm sure there was a reason but it had nothing to do with this case. It was probably I was busy, tied up on other cases that I just didn't have time to write the warrant. I don't remember if it was on the weekend or what, or I couldn't get a secretary to type itI don't know.
Q Is that unusual at the police station
A No. Some of them go a lot longer before any action is taken because we get tied up on other things and can't get turned loose right away."
[3] "Q When you say fresh scuff marks, describe that to me?

A The paint was scuffed on the side of the house. It looked to me like it was fresh. The mildew and dirt and stuff like that on the side of the house was missing."
[4] Defendant related two specific items that he had borrowed from the victim's home when neither she nor Mitchell Parker was home: (1) a hand truck and (2) a six-pack of beer. Each time defendant would notify Parker of the loan when he returned home and defendant would later replace the item. Defendant commented that Parker seemed pleased that he had made himself at home, since Parker had once remarked, "Now, you're acting like a neighbor."
[5] Defendant testified as follows:

"Q What happened when you got to the Parker residence?
A I knocked on the door like I normally do and opened the door and stuck my head in and hollered, Mitch, and
Q Did youyou say you knocked on the door?
A Knocked on the door.
Q Did youwas this a practice of yours when entering
A Knock on the door, turn the knob and stick your head in.
Q Had you done this before?
A Yes, I have.
Q Without a return or reply from someone inside?
A Yes.
Q Any time Mr. Parker enter your home the same way?
A Yes, he did.
Q And you thought nothing of him coming in like that?
A Because we were, you know, so close to each other and being next door neighbors, if we're in the back part of the house, we'd even be outside; he might be out in his back yard and knock on the door and step in and say, holler, because he might not necessarily hear them knocking on the front door."
[6] "A. When a defendant has been convicted of a felony or misdemeanor, the court should impose a sentence of imprisonment if:

(1) There is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime;
(2) The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution; or
(3) A lesser sentence will deprecate the seriousness of the defendant's crime.
B. The following grounds, while not controlling the discretion of the court, shall be accorded weight in its determination of suspension of sentence or probation:
(1) The defendant's criminal conduct neither caused nor threatened serious harm;
(2) The defendant did not contemplate that his criminal conduct would cause or threaten serious harm;
(3) The defendant acted under strong provocation;
(4) There was substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;
(5) The victim of the defendant's criminal conduct induced or facilitated its commission;
(6) The defendant has compensated or will compensate the victim of his criminal conduct for the damage or injury that he sustained;
(7) The defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the instant crime;
(8) The defendant's criminal conduct was the result of circumstances unlikely to recur;
(9) The character and attitudes of the defendant indicate that he is unlikely to commit another crime;
(10) The defendant is particularly likely to respond affirmatively to probationary treatment; and
(11) The imprisonment of the defendant would entail excessive hardship to himself or his dependents.
C. The court shall state for the record the considerations taken into account and the factual basis therefor in imposing sentence." C.Cr.P. 894.1.
[7] "Simple burglary of an inhabited home is the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in Article 60.

Whoever commits the crime of simple burglary of an inhabited dwelling shall be imprisoned at hard labor for not less than one year, without benefit of parole, probation or suspension of sentence, nor more than twelve years." R.S. 14:62.2.