913 So.2d 843 (2005)
STATE of Louisiana
v.
Derrick SCOTT.
No. 2004-KA-1142.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 2005.
*845 Eddie J. Jordan, Jr., District Attorney, Yolanda J. King, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY, and Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
On 1 August 1997, the state charged the defendant, Derrick Scott, with six counts of armed robbery (docket number 391-164), a violation of La. R.S. 14:64. At his arraignment on 8 August 1997, the defendant pled not guilty. On 30 September 1997, the trial court denied the defendant's Motions to Suppress and found probable cause.
The case was set and re-set for trial on several occasions as a result of continuances requested by both the state and the defense, and by lunacy hearings on 7 July 1998, 11 March 1999, and 10 August 1999 at which the defendant was adjudged incompetent.
Following a fourth lunacy hearing on 28 October 1999, the trial court found the defendant competent to proceed and set trial for 24 January 2000. When the case was called for trial on 24 January 2000, the state requested a continuance, which the trial court denied. Immediately thereafter, the state entered a nolle prosequi, and later the same day filed a bill of information under docket number 412-187 charging the defendant with the same six counts of armed robbery as it had charged in the nolle prosequied case. The defendant was arraigned on 7 February 2000, and pled not guilty.
The case proceeded to trial by jury on 11 July 2000 after which the defendant was found guilty as charged on all counts. He was sentenced on 1 September 2000, to ninety-nine years imprisonment without benefit of parole, probation, or suspension of sentence on each count.
The defendant was granted an out of time appeal on 28 January 2004.

*846 STATEMENT OF FACTS

Donald and Edith Doll
New Orleans Police Officer Cortez Hankton was dispatched to Philip Street on the evening of 14 May 1997 to investigate the armed robbery of Donald Doll and Edith Doll. The victims described their assailant to Officer Hankton as a twenty to twenty-five year old black male, 5'9" tall, of medium build, weighing approximately 165 pounds, and wearing dark pants, a striped T-shirt, and tennis shoes. Mr. Doll also noted that the assailant had distinctive eyes that had "a far away" look.
Donald Doll testified that during the early evening hours on the night of the robbery, he and his wife were babysitting four-year-old Jack and Jack's six-year-old sister, Amelia. At approximately 9:45 p.m., Mr. And Mrs. Doll drove the children in the Dolls' bluish green, 1993 Geo Prizm automobile to the children's home on Philip Street. Mrs. Doll removed Amelia from the car and walked toward the Philip Street residence. As Mr. Doll lifted Jack from the car seat, he noticed a black male on a bicycle standing in front of his wife. Mr. Doll heard his wife say: "He's got a gun." Mr. Doll instructed his wife to surrender her purse to the assailant, which she did. The assailant then backed his bike up and pointed the gun, which Mr. Doll described as a revolver with a long barrel, at Mr. Doll and demanded money. Mr. Doll handed the assailant his wallet. The assailant grabbed Mr. Doll's car keys. The Dolls made it to the safety of the residence with the children as the assailant drove away in the Dolls' vehicle. About two weeks after the robbery, Detective Hockman and an associate displayed a photographic lineup for the Dolls at their residence. Mr. Doll immediately identified the defendant as his assailant from the six-picture lineup. Mr. Doll emphatically stated that the defendant was the armed assailant who robbed him and his wife on 14 May 1997.
Mrs. Doll corroborated her husband's testimony. Further, she noted that the defendant also pointed his gun at each of the children on the night of the robbery. Mrs. Doll described the defendant's eyes as "weird, empty  as if he was on something." Her purse, which the assailant took, contained her American Express and AT & T credit cards. Mrs. Doll could not make a positive identification of the assailant from a photographic lineup. She identified her credit cards at the trial. When the police recovered the Doll vehicle sometime after the robbery, it was damaged extensively  scratched, the radio was missing, and the seats were torn and/or removed.
Detective Jeffrey Hockman, a ten year New Orleans Police Department ("NOPD") veteran, conducted the follow up investigation of the Doll robbery, and developed the defendant as the suspect. Mrs. Doll's credit cards were recovered from a dumpster in the South Carrollton Avenue area. Detective Hockman presented the photographic lineup to the Dolls. Mr. and Mrs. Doll viewed the pictures apart from one another. Mr. Doll made a positive identification of the defendant; however, Mrs. Doll was uncertain. Based upon Mr. Doll's identification, Hockman obtained an arrest warrant for the defendant. The defendant's girlfriend alerted the police to the location of the Doll vehicle. Police obtained a search warrant for the vehicle and seized credit cards, driver licenses and other items. At the time of his arrest, the defendant was a 5'8" tall, 165 pounds, clean-shaven, muscularly built, dark complected, and twenty years old.
Natasha Moore testified that she was the defendant's girlfriend of two and one-half years. In May 1997, the defendant *847 was driving a green Prizm vehicle, which he told her a friend had given him. Prior to that time, the defendant did not own or drive a vehicle. Ms. Moore drove the Prism but abandoned it when it broke down.
NOPD crime lab technician, Officer Terence Allen, testified that he dusted for fingerprints the Dolls' vehicle and objects retrieved from the vehicle. However, because of the smooth surfaces of the items dusted, the eleven fingerprints lifted were not identifiable.

Teresa Solomon Murphy and Owen Murphy
Officer Eric Carr investigated the armed robbery of Teresa and Owen Murphy on 25 March 1997 in the 4600 block of Venus Street. The victims described their assailant as a black male, approximately 5'8" tall, 150 pounds, heavy build with short black hair. The victims also related that their assailant, armed with a revolver, robbed them of their money, a man's watch, and several credit cards.
Mrs. Murphy testified that she, her husband and their five-year-old daughter drove into their driveway at about 8:00 p.m. on the night of the robbery. Mr. Murphy proceeded to remove the couple's daughter from the car as Mrs. Murphy unloaded the back of their vehicle. The suspect walked up to her and brandished a gun. When Mr. Murphy came to the back of the car holding their daughter, the suspect aimed his gun at the child. Mrs. Murphy gave the suspect her purse and retrieved her husband's wallet from the car and handed it to the suspect, who also took Mr. Murphy's wristwatch. The suspect backed down the street with his gun still pointed at the Murphys but then changed directions and once again approached the victims. Mrs. Murphy feared he was returning to shoot them, but instead, the suspect placed the gun on the ground and ran away. Mrs. Murphy described the suspect as a black male with a semi-bushy haircut, stocky build, probably twenty to twenty-five years of age, 150 to 160 pounds with a "very pronounced" slant to his eyes. At her home about two weeks after the robbery, Mrs. Murphy viewed a photographic lineup compiled by Detective Justin Crespo from which she immediately identified the defendant as the person who robbed and threatened her and her family.
Mr. Murphy's testimony mirrored his wife's recitation of facts. He added, however, that before he exited his vehicle, he noticed a dark green or blue sub-compact car, occupied by two young black males, drive by. Within about three minutes of the car's passing, the armed suspect appeared. The sub-compact car drove by again while the crime was in progress but this time only the black male driver was in the vehicle. A few days after the robbery, Mr. Murphy identified the defendant from a photographic lineup presented to him by Detective Crespo. Shortly after the defendant's arrest, Mr. Murphy verified that the watch, which Detective Crespo seized from the defendant, was the same watch Mr. Murphy surrendered the night of the robbery. Both Mr. and Mrs. Murphy identified the defendant at trial.

Lenette and Matthew Ponseti
Detective Justin Crespo performed the follow up investigation of the defendant in both the Murphy and Ponseti armed robberies. The detective made an in-court identification of the defendant.
During the 29 May 1997 armed robbery of Lenette and Matthew Ponseti, the suspect took Mrs. Ponseti's purse and Mr. Ponseti's wallet and an envelope containing $1,200.00. Mr. and Mrs. Ponseti described the suspect as around twenty years old, 5'6" to 5'8" tall, 170 pounds with a round face. The evening of the robbery *848 Mr. and Mrs. Ponseti separately viewed a photographic lineup at their home. Without hesitation, each victim identified the defendant. Based upon the Ponsetis' identifications, the detective obtained an arrest warrant and the defendant was arrested on 4 June 1997. Crespo noticed that the watch the defendant was wearing at the time of his arrest fit the description of the watch Mr. Murphy reported stolen from him. On 12 June 1997, Crespo showed the watch to Mr. Murphy, who identified it as his.
Mrs. Lenette Ponseti testified that she, her husband, and their four-year-old daughter and seven-year-old son were robbed at gunpoint upon returning home from the bank. Around 10:30 a.m. on the morning of the robbery, the family drove into their driveway. Her husband exited the car and went into the garage. While Mrs. Ponseti and the two children unloaded the car, she noticed a stranger standing across the street watching them. She felt uneasy and led her children to the front porch. As they made it onto the porch, the suspect ran over to them with gun in hand and demanded money. Mrs. Ponseti gave him her purse. The suspect then ran toward the garage and her husband. She alerted her husband to the suspect's presence and made her children lie down on the porch. She feared the suspect would shoot her husband. Mrs. Ponseti described the suspect to the police as being a black male, approximately eighteen to twenty years old, around 5'8" in height, weighing approximately 160 pounds, and having droopy or heavy eyes. Later that afternoon, Mrs. Ponseti identified the defendant from a photographic lineup shown her by Detective Crespo. She also identified the defendant in court.
Mr. Ponseti testified that as he finished in the garage, he heard his wife call to him. As he walked out of the garage, the suspect pointed a gun at him. Mr. Ponseti gave the suspect his wallet and pager. The suspect reached into Mr. Ponseti's pocket and removed the bank envelope containing $1,200.00. When the suspect ran away, Mr. Ponseti ran to the front porch to secure his family. Mr. Ponseti described the suspect to Detective Crespo as a 5'8", 170 pounds, twenty-year-old black male with short, full hair, and droopy/heavy eyes. Later that evening, Mr. Ponseti identified the defendant's picture from the lineup presented to him by Detective Crespo. He noted that the defendant's eyes were unmistakable. Mr. Ponseti further stated that he was 100% certain that the defendant was the same man who robbed him.

ERRORS PATENT
A review for errors patent on the face of the record reveals none.

ASSIGNMENT OF ERROR NUMBER 1
In the first of three assignments, the defendant contends his right to appellate review has been violated by the trial court's failure to protect the record. Specifically, the defendant complains that he is prejudiced by the lack of the transcript of his Motion to Suppress.
La. Const. Art. I, § 19 provides that "[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based." La.C.Cr.P. art. 843 requires, in all felony cases, the recording of "all the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel." As a corollary, La. R.S. 13:961 C provides that, in criminal cases tried in the district courts, the court reporter shall record all portions of the proceedings required *849 by law and shall transcribe those portions of the proceedings required. A criminal defendant has a right to a complete transcript of his trial proceedings, particularly where appellate counsel on appeal was not also trial counsel. State v. Landry, 97-0499, p. 3 (La.6/29/99), 751 So.2d 214, 215. "[W]here a defendant's attorney is unable, through no fault of his own, to review a substantial portion of the trial record for errors so that he may properly perform his duty as appellate counsel, the interests of justice require that a defendant be afforded a new, fully recorded trial." Id., quoting State v. Ford, 338 So.2d 107, 110 (La.1976).
In State v. Frank, 99-0553, p. 21 (La.1/14/01), 803 So.2d 1, 19-20, the Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. First, "[m]aterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal." 99-0553 at pp. 20-21, 803 So.2d at 19-20, citing State v. Robinson, 387 So.2d 1143 (La.1980)(reversing given that testimony of a state and defense expert witness was missing); State v. Ford, 338 So.2d 107 (La.1976)(finding omissions material, given that substantial portions of the record were missing, including the testimony of four state witnesses, voir dire examination of prospective jurors, and the prosecutor's opening statements); see also State v. Bright, 00-1255, p. 8 (La.App. 4 Cir. 2/6/02), 809 So.2d 1112, 1117 (finding record inadequate, given "[t]he cumulative effect of the missing portions of testimony of the defendant and other material witnesses, and the frequency of `inaudible' and `spelled phonetically' in the transcript"); State v. Diggs, 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104, citing Ford, supra, (finding the unavailability of an officer's complete testimony necessitated a new trial because it could not be determined whether the missing testimony was substantial or inconsequential). Second, "inconsequential omissions or slight inaccuracies do not require reversal." Frank, supra, citing State v. Goodbier, 367 So.2d 356, 357 (La.1979)(declining to reverse when record did not include transcript of voir dire examination and the court reporter's affidavit indicated that no objections were made by the attorneys during voir dire); see also State v. Lyons, 597 So.2d 593 (La.App. 4 Cir.1992)(declining to reverse when record did not include some of the jury charges, transcript of voir dire, impaneling of jury or opening statement). Third, and "[f]inally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts." Frank, supra, citing State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773. However, this court has held that under some circumstances a complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record. See, e.g., State v. Cooley, 98-0576, p. 9 (La.App. 4 Cir. 11/17/99), 747 So.2d 1182, 1187. An incomplete record may be adequate for appellate review. State v. Hawkins, 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480. Finally, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts. State v. Castleberry, 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773.
In this case, the six victims testified at trial. The five victims who made positive pre-trial identifications of the defendant testified that they were certain the defendant robbed them at gunpoint because of the length of their unobstructed view of, and close proximity to, the defendant during their individual ordeals. The victims supplied the police with echoing physical descriptions of the defendant, and victims *850 specifically noted the defendant's distinctive eyes as a basis for their unwavering identifications. Five of the six victims unequivocally and immediately identified the defendant from a photographic lineup, which he/she viewed independently of anyone but the investigating detective. Moreover, the identifying victims emphatically testified that they were neither influenced nor coerced to identify the defendant's picture. None of the witnesses discussed his/her identification of the defendant with anyone prior to viewing the photographic lineup. Moreover, Detective Crespo's trial testimony corroborated that the victims' identifications of the defendant were independent, unequivocal, and untainted by suggestion or coercion.
In State v. Brown, 00-2120 (La.App. 4 Cir. 12/19/01), 804 So.2d 863, writ denied, 02-0308 (La.2/7/03), 836 So.2d 85, the defendant claimed that his conviction and sentence should be vacated because the record was missing a transcript from the motion to suppress hearing. However, we noted that the defendant did not argue that there was any inconsistency between the detective's testimony at the suppression hearing and at trial. Likewise, the defendant herein cannot point to any inconsistency in any of the six victims' testimony relating to any aspect of this case. We further note that the defendant had the benefit of hearing almost the entirety of the state's case years before the actual trial and could have obtained a transcript of the motion to suppress hearing at any time during that period in order to challenge the victims' identifications.
The record omission in this case does not satisfy the three-part test described in Frank, supra, nor has the defendant shown any prejudice by the absence of the transcript of the pre-trial hearing on the motion to suppress. This assignment is meritless.

ASSIGNMENT OF ERROR NUMBER 2
In this assignment, the defendant claims the state's action of dismissing and then re-instituting charges the same day constituted not only an abuse of power but also violated his rights to a speedy trial and appellate review, prejudicing him by the loss of the transcript of the hearing on his motion to suppress.
The Louisiana Code of Criminal Procedure authorizes the state to dismiss any prosecution without obtaining the trial court's consent. La.C.Cr.P. art. 691. The only limitation the Legislature placed on the state's authority to reinstitute charges is set forth in La.C.Cr.P. art. 576. See State v. Larce, 01-1992 (La.App. 4 Cir. 1/23/02), 807 So.2d 1080. Article 576 provides that when the state has dismissed a timely instituted criminal proceeding, the state may institute new charges for the same offense "within the time limits established by this Chapter or within six months from the date of dismissal, whichever is longer;" however, the state must show that the dismissal of the original prosecution was not for the purpose of avoiding the time limitations set by Article 578. La.C.Cr.P. art. 576. Given that the charge in question is a non-capital felony, Article 578 requires that the state bring the defendant to trial within two years from the date of the bill of information. La.C.Cr.P. art. 578.
The right to a speedy trial is guaranteed by both the federal and state constitutions. U.S. Const. Amendment 6; La. Const. Art. I, § 16. In addition to the statutory right to a speedy trial recognized by La.C.Cr.P. art. 701(A), a defendant also has a fundamental, constitutional right to a speedy trial. In analyzing a constitutional speedy trial violation claim, the four factor test forth in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) is applied; to wit: (1) *851 the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant. The initial factor, the length of the delay, is often referred to as the "triggering mechanism" because absent a "presumptively prejudicial" delay, further inquiry into the Barker factors is unnecessary. See State v. Santiago, 03-0693 (La.App. 4 Cir. 7/23/03), 853 So.2d 671. Under Barker, the peculiar circumstances of the case determine the weight to be ascribed to the length of the delay and the reason for the delay. State v. Reaves, 376 So.2d 136, 138 (La.1979). Something that is acceptable in one case may not be acceptable in another because the complexity of the case must be considered. Gray v. King, 724 F.2d 1199, 1202 (5th Cir.1984), citing Barker, 407 U.S. at 531, 92 S.Ct. 2182. The manner of proof must also be considered, as must the gravity of the alleged crime. Id.
A defendant challenging the state's dismissal and reinstitution of charges has the burden of showing a violation of his constitutional right to a speedy trial. State v. Henderson, 00-0511, p. 7 (La.App. 4 Cir. 12/13/00), 775 So.2d 1138, 1142.
In this case, the judge called the matter for trial on January 24, 2000. The state requested a continuance, citing the defendant's plea of not guilty by reason of insanity and the state's belief the defendant had not been examined by all of the mental health experts. The state also advised the court that several of its witnesses were unavailable because they had not been served with subpoena or notice of trial. The trial judge denied the state's motion, and the state nolle prosequied the six counts of armed robbery.[1]
While the delay between the filing of the original bill of information in this case and the defendant's trial was significant, that delay was the result of some factors beyond the control of either the defendant or the state. There were four lunacy hearings in this matter, all of which were set and continued on several occasions, owing to requests by the state, the defense, and the court, as well as delays due to trial continuances from both sides. Further delay occurred in determination of counsel, time to file pre-trial pleadings, the defendant's change of his not guilty plea to not guilty and not guilty by reason of insanity and for compelling attendance of witnesses at trial. Given the seriousness of the charges and procedural journey of this case, and recognizing that none of the delays occasioned by the state was deliberate or designed to hamper the defense, it does not appear that the defendant's right to a speedy trial was violated. See State v. Alfred, 337 So.2d 1049 (La.1976); State v. Love, 00-3347 (La.App. 4 Cir. 5/23/03), 847 So.2d 1198. Nor has the defendant made a persuasive argument that his appellate rights have been impinged. The defendant has not shown that the missing transcripts of the motion to suppress prejudiced him. As noted in discussion of the first assignment of error, all of the victims testified at trial and unequivocally identified the defendant as their assailant. This assignment is without merit.

ASSIGNMENT OF ERROR NUMBER 3
In his final assignment of error, the defendant complains his sentence is excessive.
Article I, Section 20 of the Louisiana Constitution of 1974 provides that "No law shall subject any person ... to cruel, excessive or unusual punishment." A sentence within the statutory limit is *852 constitutionally excessive if it is "grossly out of proportion to the severity of the crime" or is "nothing more than the purposeless imposition of pain and suffering." State v. Caston, 477 So.2d 868 (La.App. 4 Cir.1985). Generally, a reviewing court must determine whether the trial judge adequately complied with the sentencing guidelines set forth in La.C.Cr.P. art. 894.1 and whether the sentence is warranted in light of the particular circumstances of the case. State v. Soco, 441 So.2d 719 (La. 1983); State v. Trepagnier, 97-2427 (La. App. 4 Cir. 9/15/99), 744 So.2d 181.
If adequate compliance with La. C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular defendant and the circumstances of his case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Quebedeaux, 424 So.2d 1009 (La.1982).
If the judge records the factors affecting his sentencing decision, the sentence should not be set aside as excessive unless it is grossly disproportionate to the offense or represents nothing more than the needless infliction of pain and suffering. State v. Pike, 426 So.2d 1329, 1335 (La.1983).
In this case, the defendant was convicted of six counts of armed robbery, in violation of La. R.S. 14:64, which at the time of the offenses provided for a sentence of imprisonment at hard labor for not less than five years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. The defendant received the maximum sentence. A review of the jurisprudence reveals that ninety-nine year sentences imposed upon defendants convicted of armed robbery have been upheld. State v. Falkins, 04-250 (La.App. 5 Cir. 7/27/04), 880 So.2d 903, writ den. 04-2220 (La.1/14/05), 889 So.2d 266; State v. Styles, 96-897 (La. App. 5 Cir. 3/25/97), 692 So.2d 1222; State v. Wilson, 452 So.2d 773 (La.App. 4 Cir.1984). In State v. Douglas, 389 So.2d 1263, 1267 (La.1980) the Louisiana Supreme Court noted:
This court does not lightly consider the matter of a 99-year sentence imposed without hope of release on parole. There may be sound arguments against the frequent use of such sentences, but these arguments address themselves to the reasoned discretion of the sentencing judge. The function of the reviewing court is not merely to substitute this court's judgment for that of the trial court, but to determine whether the court below manifestly abused its discretion.
In sentencing the defendant in this case on September 1, 2000, the trial judge noted:
Mr. Scott, you are here for sentencing today and the six counts of armed robbery that you have, this involves something that is unconscionable as far as I am concerned. That all were people getting out of their cars with children with small children and guns being put (sic) the children's heads.
I don't normally give this type of sentence that I am going to give today, but I feel that this sentence is appropriate because of the fact of what had to go through those parents' minds when the gun was placed on their children's head. And, we are talking about very, very young children. These were very, very young children....
Considering the foregoing, we do not find that the trial judge abused his discretion or that the sentences are excessive. This assignment is meritless.

*853 CONCLUSION

The convictions and sentences affirmed.
AFFIRMED.
NOTES
[1] The district court judge held the state in contempt and imposed a fine of $100.00.