JAMES F. McKAY, III, Chief Judge.
h Kerry Cureaux, the defendant, appeals his conviction for possession of heroin and his sentence of twenty years at hard labor as a fourth felony offender pursuant to La. R.S. 15:529.1. We affirm his conviction. However, we reverse the trial court judgment sentencing the defendant as a fourth felony offender, vacate the defendant’s sentence and reinstate the defendant’s original sentence of seven years at hard labor.
STATEMENT OF CASE
On November 18, 2009, the State of Louisiana charged the defendant, by bill of information, with one count of possession of heroin. The defendant pled not guilty to this charge at his arraignment on November 23, 2009. The trial court heard and denied his motion to suppress the evidence on March 12, 2010. Although the defendant objected and noted his intent to seek writs, he did not do so. The defendant elected a jury trial, and on June 2, 2010, the jury found him guilty as charged. The defendant orally moved for a new trial, and he filed a written motion on July 7, 2010, the date that the court denied the motion. On August 13, 2010, the court sentenced the defendant to serve seven years at hard labor. On November 4, 2011, the court found him to be a fourth felony |2offender. Three days later, the court sentenced the defendant to serve twenty years at hard labor as a fourth felony offender. The court also granted the'defendant’s motion for appeal on that date.
The appeal record was lodged in this Court on March 6, 2012. Counsel for the defendant filed a brief on his behalf on July 10, 2012, and the State responded on July 30, 2012. The defendant filed a pro se brief on August 7, 2012.
FACTS
On November 12, 2009, police officers arrested the defendant after he abandoned a package containing heroin on the front steps of 2418 North Claiborne Avenue. Officer Monroe Dillon, one of the arresting officers, testified at trial that he and his partner, Officer Demond Harris, were on patrol at approximately 9:00 p.m. on that night and were driving river-bound on Music Street when they stopped at the corner of North Claiborne. They saw the defendant standing in the middle of the neutral ground on North Claiborne, and he was arguing with a woman, later identified to be Deneene Jones, who was standing in the doorway of the residence at 1428 North Claiborne. Officer Dillon testified that the defendant and the woman were cursing each other so loudly that the officers could hear them even though the windows in them police unit were closed. The officers turned the corner and pulled up in the left lane next to the defendant. Officer Dillon stated that they activated the police unit’s.lights in order to keep traffic away from the defendant. They then exited their police unit and called for the *835 defendant to come over to them. Officer Dillon testified that the defendant looked back at them but then he turned back around and started walking toward the woman’s residence. Officer Dillon stated that the defendant continued to berate the woman, and he approached |sher with both of his fists clenched. Fearing that the defendant was going to try to harm the woman, the officers followed him, ordering him to stop.
Officer Dillon testified that as the defendant walked up the stairs onto the porch, he opened his left hand, dropped an object, and continued walking up the stairs. Officer Harris caught up with the defendant and detained him, walking him back down the stairs. Officer Dillon retrieved the object that the defendant dropped and found it to be a torn Kool-Aid package. Officer Dillon testified that he went up to the woman and asked her if she was all right, and as he spoke with her, he looked inside the Kool-Aid package using a flashlight and noticed that a beige powder had been mixed in with the blue/purple Kool-Aid powder inside the package. Officer Dillon testified that he knew that drug users sometimes mix drugs with Kool-Aid because the acid in the Kool-Aid helps to break down the drugs for intravenous use. Officer Dillon testified that he closed up the package and placed it temporarily into his pocket. He went to the police unit and conducted a field test on the contents of the package, the result of which was positive for heroin and measured 1.8 grams.
Officer Dillon admitted on cross-examination that he did not know what caused the acid in Kool-Aid to break down drugs. He stated that he conducted the field test of the contents of the packet at the car, and he explained to the jury how he conducted the test. He identified exhibit D-2, the Central Evidence and Property receipt for the Kool-Aid package which indicated that the package contained blue and beige powder weighing 1.8 grams. He also identified defense photographs of the residence where the incident occurred.
The testimony of Officer Demond Harris basically tracked that of Officer Dillon. In addition he testified that he and Officer Dillon repeatedly asked the |4defendant to come to them, but the defendant ignored them, and they followed him because of his balled fists and his continued cursing at the woman. He testified that the defendant had gotten to the top of the stairs by the time he caught up to him. He agreed that the defendant did not resist him. Officer Harris denied that either he or his partner searched or even entered the woman’s house. He stated that the only contraband they recovered was the heroin inside the Kool-Aid package.
The parties stipulated that if Sergeant Harry O’Neal were called, he would be qualified as an expert in the testing and analysis of narcotics. They also stipulated that Sergeant O’Neal would testify that he received the evidence listed in exhibit S-l, examined it on December 4, 2009, found that it testified positive for heroin, and returned it to Central Evidence and Property on December 15, 2009. The parties also stipulated to exhibit S-2, Sergeant O’Neal’s crime lab report.
The sole defense witness was Deneene Jones, who testified that she lived at 2418 North Claiborne. She testified that she had known the defendant for thirteen to fourteen years, and on the day of his arrest, he was living with her. She characterized the incident as a “misunderstanding,” insisting that she and the defendant were not arguing on the night of his arrest. Instead, the defendant arrived at the house and knocked on the door to be admitted, but because she was in the back of the house, she did not immediately hear his knock. She testified that she eventually *836 heard the knock and went to the door, and when the defendant identified himself, she opened the door and told him to come inside. She testified that at that point, the two officers pulled up and told her that they had received a call which she described as “it was a misunderstanding, like a complication [sic] of somebody fussing and things like that. But it wasn’t like that.” She denied that Rshe and the defendant had been fighting; instead, the defendant had come to her house to get some food and had brought with him some Kool-Aid to go with the food. She denied that the defendant had any drugs in his possession that night, and she insisted that she did not allow drugs into her house. She testified that before the defendant could walk through the door, the officers grabbed him, put his hands behind his back, took him down the stairs to the police car, and handcuffed him. She testified that the officers searched the defendant’s pockets and pulled out two packages of Kool-Aid, one was lemonade and the other blueberry. She testified that while one officer did not want to arrest the defendant, the other one did and told her to mind her own business when she questioned them. She denied seeing the officers conduct a field test, even though she watched them from her porch. She estimated that the officers were in front of her house for an hour from the time that they grabbed the defendant. She stated that another officer drove by and stopped to talk with the two arresting officers, but that officer then drove away.
On cross-examination, Deneene Jones explained that although the defendant was living with her, he did not have a key to the house because she had the only key. She estimated that he had lived with her for six months, but she stated that he also stayed at his mother’s house part of the time. She described the defendant as only a friend, and she denied that they had any children together. She described for defense counsel how she thought a field test is done, but she admitted that she had never observed one; instead, she had only observed lab tests in a health clinic. She then admitted that because she did not know how an officer conducts a field test, she could not say if Officer Dillon completed a field test.
After closing arguments, the jury instructions, and the adjournment of the jury to deliberate, the State re-called Officer Harris. Officer Harris testified that | fiwhile his partner was testifying, he saw someone, whom he identified as still sitting in the courtroom and wearing a State emblem on his shirt, come out of the courtroom twice, go to Deneene Jones, and speak with her. He did not hear what the man said to Deneene Jones. He stated that later, after he testified, he walked past the same man, who was again speaking with Deneene Jones, and he heard the man tell her that he (Officer Harris) testified that he and his partner did not enter her house.
DISCUSSION

Assignments of Error by Counsel

I.
As filed by counsel, on behalf of the defendant, in the first assignment of error, he contends that the trial court erred by denying his motion to suppress the evidence. He asserts that the officers could not lawfully seize the Kool-Aid package because they had no basis upon which to chase him up onto the steps, given that he and Deneene Jones were no longer arguing at the time he approached the porch where she was standing. He concludes that because he threw down the Kool-Aid package as a result of their unlawful infringement on his rights, its seizure was illegal, and the court should have granted *837 his motion to suppress the evidence. This claim has no merit.
As per La.C.Cr.P. art. 703D, the State has the burden of showing any evidence seized in the absence of a warrant was lawfully seized. See State v. Wells, 2008-2262 (La.7/6/10), 45 So.3d 577. It is well-settled that an appellate court should review a trial court’s ruling under a deferential standard with regard to factual determinations, while legal findings are subject to a de novo standard of review. State v. Hunt, 2009-1589, p. 4 (La.12/1/09), 25 So.3d 746, 751; State v. Hampton, 98-0331, p. 18 (La.4/23/99), 750 So.2d 867, 884. Moreover, a trial court’s decision relative to the suppression of evidence is afforded great weight and will not be set aside unless there is an abuse of that discretion. Wells, supra, 2008-2262, pp. 4-5, 45 So.2d at 581. As noted by the Court in State v. Thompson, 2011-0915, pp. 13-14 (La.5/8/12), 93 So.3d 553, 563:
The analysis may be further broken down into the component parts of the trial court decision. “When a trial court makes findings of fact based on the weight of the testimony and the credibility of the witnesses, a reviewing court owes those findings great deference, and may not overturn those findings unless there is no evidence to support those findings.” Wells, 2008-2262, p. 4; 45 So.3d at 580; State v. Hunt, 2009-1589, p. 6 (La.12/1/09); 25 So.3d 746, 751. Legal findings or conclusions of the trial court are reviewed de novo. Id.; State ex rel. Thibodeaux v. State, 2001-2510, p. 1 (La.3/8/02); 811 So.2d 875.
Because the evidence was seized in this case without a warrant, the State bore the burden of showing that it was lawfully seized.
Only Officer Harris testified at the suppression hearing, but his testimony did not vary much from his trial testimony. In addition to his trial testimony, Officer Harris testified that he and his partner pursued the defendant because he and De-neene Jones continued arguing, and they feared that he was going to try to hit her, as his hands were clenched into fists as he approached her. He also testified that Deneene Jones told his partner that she and the defendant were fighting because she had put him out of the house. He insisted that neither he nor his partner had any idea that the appellant was in possession of drugs until he dropped the Kool-Aid package.
Officer Dillon seized the Kool-Aid package containing the heroin after the defendant dropped it as he walked up the stairs, with the officers following him hand intending to stop him before he reached Deneene Jones, who was standing on the porch. Officers cannot legally seize property abandoned by a defendant if the abandonment occurred pursuant to an infringement on the defendant’s privacy rights. However:
[i]f ... property is abandoned without any prior unlawful intrusion into a citizen’s right to be free from government interference, then such property may be lawfully seized. In such cases, there is no expectation of privacy and thus no violation of a person’s custodial rights.
State v. Belton, 441 So.2d 1195, 1199 (La.1983). See also State v. Britton, 93-1990 (La.1/27/94), 633 So.2d 1208; State v. Tucker, 626 So.2d 707 (La.1993), opinion reaffirmed and reinstated on rehearing by 626 So.2d 720 (La.1993); State v. Williams, 2007-0700 (La.App. 4 Cir. 2/13/08), 977 So.2d 1101; State v. Handy, 2002-1025 (La.App. 4 Cir. 9/25/02), 828 So.2d 1207. In Britton, the Court noted that “the police do not need probable cause to arrest or reasonable suspicion for an investigatory stop every time they ap *838 proach a citizen in a public place.” Britton, 93-1990 at p. 2, 633 So.2d at 1209.
In Handy, this Court discussed a stop for purposes of determining whether abandoned property may be lawfully seized:
An “actual stop” occurs when an individual submits to a police show of authority or is physically contacted by the police. Tucker. An “imminent actual stop” occurs when the police come upon an individual with such force that, regardless of the individual’s attempts to flee or elude the encounter, an actual stop of the individual is virtually certain. Id. The Supreme Court listed the following factors to be considered in assessing the extent of police force employed in determining whether that force was “virtually certain” to result in an “actual stop” of the individual: (1) the proximity of the police in relation to the defendant at the outset of the encounter; (2) whether the individual has been surrounded by the police; (3) whether the police approached the individual with their weapons drawn; (4) 13whether the police and/or the individual are on foot or in motorized vehicles during the encounter; (5) the location and characteristics of the area where the encounter takes place; and (6) the number of police officers involved in the encounter. Id. An actual stop is imminent “when the police come upon an individual with such force that, regardless of the individual’s attempts to flee or elude the encounter, an actual stop of the individual is virtually certain.” Tucker, 626 So.2d at 712. (emphasis supplied)
Handy, at pp. 4-5, 828 So.2d at 1210.
Although the officers had not actually stopped the appellant before he threw down the Kool-Aid package, it was evident that they intended to stop him. They called him to come to the car while he was still standing on the neutral ground, and when he ignored them and started toward the porch where Deneene Jones stood, they followed him. Officer Harris apprehended him as he reached the top of the steps, just after he abandoned the Kool-Aid package. The officers’ actions constituted an imminent actual stop, for which they needed at least reasonable suspicion of criminal activity.
As per La.C.Cr.P. art. 215.1, an officer may stop a person and question him if the officer has reasonable suspicion that the person has committed or is about to commit an offense. State v. Temple, 2002-1895 (La.9/9/03), 854 So.2d 856. See also Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Reasonable suspicion is less than the probable cause needed to arrest a defendant; an officer “must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.” State v. Katie, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); Temple, supra, 2002-1895, p. 4, 854 So.2d at 859-860. In discussing the standard to be used by a reviewing court to determine if an officer had reasonable suspicion to detain a suspect, the Court in Temple stated:
|inIn determining whether the police possessed the requisite “ ‘minimal level of objective justification’ ” for an investigatory stop based on reasonable suspicion of criminal activity, United States v. Sokolow, 490 U.S. [1] at 7, 109 S.Ct. [1581] at 1585 [104 L.Ed.2d 1 (1989)] (quoting INS v. Delgado, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)), reviewing courts “must look at the ‘totality of the circumstances’ of each case,” a process which “allows officers to draw on their own experience and specialized training to make inferences from *839 and deductions about the cumulative information available to them that ‘might well elude an untrained person.’ ” United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 750-51, 151 L.Ed.2d 740 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)); see also State v. Huntley, 97-0965, p. 1 (La.3/13/98), 708 So.2d 1048.
Temple, 2002-1985, p. 5, 854 So.2d at 860. As noted by the Court in State v. Morgan, 2009-2352, p. 4 (La.3/15/11), 59 So.3d 403, 406: “[a]lthough reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires some minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. at 7, 109 S.Ct. 1581 at 1585, 104 L.Ed.2d 1 (1989).” As per Morgan, factors to be considered include the time of day and location of the stop, as well as the defendant’s actions prior to the stop. Morgan, 2009-2352, p. 5, 59 So.3d at 406.
Contrary to the defendant’s argument, the officers had reasonable suspicion to stop the defendant prior to the time that he threw down the Kool-Aid package. They had both observed him and Deneene engaged in a heated argument involving profanities on both sides. The defendant ignored the officers’ attempts to speak with him, choosing instead to advance on Deneene Jones with his fists clenched. Deneene Jones testified that she and the defendant were not arguing, and that the officers merely appeared as the defendant was coming in the door to the residence, indicating that they had received a call of a domestic disturbance. By contrast, | nboth officers testified that they had not received any calls concerning the argument; instead, they happened upon it, and it was so vitriolic that they could hear it through the closed windows of their vehicle. They both testified that Deneene Jones and the defendant continued the argument after the officers initially tried to intervene, and they pursued the defendant as he approached Deneene Jones with his fists clenched because they feared he would try to hurt her. The trial court apparently believed the testimony of the officers over that of Deneene Jones. A fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 2009-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 211; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111. There is nothing in the record to show that the trial court abused its discretion in its credibility determination. The evidence adduced at the motion hearing and at trial showed that the officers had reasonable suspicion to detain the appellant before he abandoned the Kool-Aid package containing the heroin, and the trial court correctly denied the motion to suppress the heroin. This assignment of error has no merit.
II.
As filed by counsel on behalf of the defendant, in the second assignment of error, he asserts that the trial court erred by finding him to be a multiple offender pursuant to La. R.S. 15:529.1, because the State failed to file a written bill charging him as a multiple offender. In support, he cites State v. Buttner, 411 So.2d 35 (La.1982), where the Court reversed the defendant’s conviction and sentence because there was no indication that a bill of information was filed in the case. The State agrees that a defendant cannot be adjudicated and sentenced on an oral bill of information. See State v. Sutton, 544 So.2d 1345 (La.App. 4 Cir.1989). 112However, the State argues that the lack of bill of information in the record does not automatically invalidate the multiple offender adjudication and sentence.
*840 In support, the State cites State v. Massey, 2009-1728 (La.App. 4 Cir. 11/5/10), 51 So.3d 808; State v. Hamilton, 2002-1281 (La.App. 4 Cir. 12/4/02), 834 So.2d 567; State v. Payne, 586 So.2d 652 (La.App. 5 Cir.1991); State v. Mitchell, 553 So.2d 915 (La.App. 4 Cir.1989); and State v. Grey, 522 So.2d 1216 (La.App. 4 Cir.1988), wherein each case the reviewing court found that the fact that the bill of information was missing from the record did not invalidate the subsequent conviction and sentence. The State points in each case to the fact that the court found no error because the defendant did not object at the time of trial to the lack of a bill. However, the defining factor in each of these cases was some indication in the record that the bill of information was actually filed. In Massey, Hamilton, and Mitchell, there were docket master entries indicating that the bill was filed. In Payne, the transcript indicated that the bill was read into the record at trial. In Grey, the minute entry of trial indicated that the bill was read aloud at trial.
Not mentioned by the State is this Court’s opinion in State v. Vincent, 2010-0764 (La.App. 4 Cir. 1/19/11), 56 So.3d 408.[1] In Vincent, neither the appeal record nor the district court contained the multiple bill of information. Although there was no clear proof that the bill was filed, the transcript showed that the multiple bill proceeding was heard and, we emphasize and, conducted pursuant to a valid multiple bill of information. Id. at 414. This Court held that because the multiple bill hearing was held, and the defendant did not object that no bill was |13filed, this Court extrapolated from the record and made the assumption that the bill had been filed. This Court found that the purpose of a bill was to give the defendant notice of the charge which he faced. In Vincent, the defendant had notice when the jury convicted him that the State intended to file a bill charging him as a multiple offender, and he conceded in his brief that he was aware of the State’s intention. This Court also noted that the defendant did not object at the multiple bill hearing that the State had failed to file a bill. In so finding, this Court cited State v. Burks, 2002-1939 (La.App. 4 Cir. 3/19/03), 843 So.2d 444, but this reliance was somewhat misplaced because in Burks, there was a minute entry that stated that the bill was filed. Based on that factor and the defendant’s failure to object that the bill had not been filed, this Court in Burks assumed that the bill had been filed.
Here, the multiple bill of information is not contained in the appeal record, and the clerk’s office in the district court has certified that it also is not contained in the district court’s record. Unlike most of the cases cited above, there is no docket master entry, minute entry, or transcript that indicates that the multiple bill was filed. Unlike in Vincent, where Mr. Vincent knew that he was being charged a fourth felony offender pursuant to La. R.S. 15:529.1, in the instant matter there is no indication that the State informed the defendant that it intended to file a multiple bill of information charging him as a fourth offender. At the original sentencing hearing, the court indicated that the State had offered the defendant a plea deal prior to trial that promised to charge him only as a second offender and an offer of seven years, but the defendant rejected the deal. As evidenced in the transcript, there was some discussion between the court and the State as to what it would ultimately charge him as. But, it is apparent that no multiple bill had been 114filed at that point be *841 cause the Assistant District Attorney asked that the court set a multiple bill hearing at a later date because that would give him time to speak with his supervisor. Trial counsel for the defendant also indicated that he had tried several times to confer with the District Attorney’s office concerning the multiple bill of information. The court then sentenced the defendant and reset the matter for a multiple bill hearing. The case was reset repeatedly for over a year due to the fact that the defendant was incarcerated in another parish, and it was not until almost fifteen months later that the multiple bill hearing was held. There is nothing in the minute entries of these dates that indicates that the State ever actually filed a multiple bill of information, and when the hearing was finally held, the defendant did not object that no bill had been filed.
Unlike most of the cases cited above, there is no indication in the record of this case that the State ever actually filed the multiple bill of information. In Vincent, even without any real proof that the bill was filed, this Court assumed that it had been filed because the State indicated that it intended to do so, and the defendant did not object at the multiple bill hearing that it had not been filed. However, here, unlike in Vincent, there is no indication that the State indicated to the defendant that it intended to charge him as a fourth offender; at the original sentencing, the ADA indicated that he had to consult his supervisor and asked the court to reset the multiple bill hearing. Therefore, as distinguished from the facts and procedure in Vincent, it is within the realm of argument that the State never clearly apprised the court or the defendant of its intention to multiple bill him as a fourth offender nor is it apparent that the defendant was ever fully informed that he had the potential of being billed and sentenced as a fourth offender. We note that while a multiple bill of information does not charge a crime, it is a method of 1r,informing the sentencing court of the circumstances and requesting an enhancement penalty. Vincent supra, 2010-0764, p. 10, 56 So.3d at 415 (citations omitted).
To reiterate, in Vincent, although there was no clear proof that the multiple bill of information was actually filed, there was evidence of a transcript showing that a multiple bill hearing proceeding was had. In the instant matter, there is no such evidence of a multiple bill of information charging the defendant as a fourth felony. Therefore, unlike Vincent, in the instant matter, the defendant was deprived of adequate notice of the enhancement.
The defendant is facing a virtual life sentence and all precautions protecting his rights are not simply axiomatic and should not just be assumed. We hold that the State must file a written bill of information charging the defendant as a multiple offender. All of the above jurisprudence clearly leads to this basic conclusion. The error is when assumptions are made without clear line of proof. Therefore, based solely on the facts of the instant matter, we find that the trial court erred in sentencing the defendant as a fourth offender as the State failed to file a multiple bill of information charging the defendant pursuant to La. R.S. 15:529.1. As such, we vacate the defendant’s sentence pursuant to La. R.S. 15:529.1 and reinstate the trial court’s original sentence.

Pro Se Assignments of Error

I. and II.
The defendant’s pro se assignments are connected. By his first pro se assignment, he alleges that the State violated his right to a fair trial by allowing the introduction of falsified evidence, a crime lab report that was introduced at the suppression hearing that pertained to a tinfoil packet of *842 heroin. By his second | ^assignment, he contends that the State withheld exculpatory evidence by not introducing the tinfoil packet at trial. Neither of these arguments has merit.
The evidence to which the defendant refers to was erroneously introduced at the March 12, 2010 suppression hearing. The State showed Officer Harris motion exhibit S — 1, which the State described as the crime lab report for an evidence bag containing one tinfoil packet containing a tan-colored powder. Officer Harris immediately responded that the report was not the one connected to this case, noting that the report was issued from the St. Tammany Parish crime lab. The court then noted: “Harry O’Neil [sic] did it. It’s fine. I know what it is.” By the time of trial, the State had produced the correct crime lab report and introduced it as trial exhibit S-2 as part of a stipulation by both parties that Officer Harry O’Neal of the N.O.P.D. crime lab tested the powder in the Kool-Aid package, the result of which was positive for heroin. In addition, during the cross-examination of Officer Dillon, the defense counsel introduced exhibit D-2, the Central Evidence and Property receipt for the evidence seized by Officer Dillon, and about which counsel stated: “And it’s also true that under the description for the evidence that you turned in it’s a blue and red Kool-Aid pack containing a blue and beige powder weighing one point eight grams, correct?” Thus, it is evident that the exhibit erroneously introduced at the suppression hearing did not pertain to this case, but the State did not introduce that exhibit at trial. Nor did the State introduce an unrelated tinfoil packet at trial. Neither of the defendant’s pro se assignments of error has merit.
Errors Patent
A review of the record reveals a patent error. When imposing the sentence as a fourth felony offender, the court failed to indicate that the sentence was to be 117served without benefit of probation or suspension of sentence as required by La. R.S. 15:529.1G. However, as per La. R.S. 15:301.1A and State v. Williams, 2000-1725 (La.11/28/01), 800 So.2d 790, the sentence is deemed to have been imposed with these restrictions of benefits, even in the absence of the trial court’s failure to delineate them. Thus, there is no need for this Court to correct the sentence. See State v. Phillips, 2003-0304 (La.App. 4 Cir. 7/23/03), 853 So.2d 675.
However, while we note that there is a patent error, that issue is moot as we have reversed and vacated the trial court judgment finding the defendant to be a fourth felony offender.
CONCLUSION
We find no merit to the defendant’s assignments of error concerning his conviction. Therefore, we affirm his conviction. Regarding the issue concerning the State’s failure to file a multiple bill, based on the above discussion and applicable jurisprudence we reverse the trial court sentence pursuant to La. R.S. 15:529.1, vacate the defendant’s sentence as a fourth felony multiple offender and render judgment reinstating the defendant’s original sentence of seven years at hard labor.
AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART; AND RENDERED

. Writ denied. 2011-0315 (La.6/17/11), 63 So.3d 1038.